2007 UT 63

Carmen SNOW, Sarah Meier, Jeanetta Williams, Pat Rusk, and Lamont Tyler, Petitioners,

v.

OFFICE OF LEGISLATIVE RESEARCH AND GENERAL COUNSEL, Respondent.

Curtis S. Bramble, in his capacity as a Senator for the State of Utah; Stephen H. Urquhart, in his capacity as a House Representative for the State of Utah; Brenda Larner, an individual; Laura Johnson, an individual; Peggy Maciel, an individual; and Parents for Choice in Education, Inc., a Utah corporation, Petitioners,

v.

Office of Legislative Research and General Counsel, a government entity; and Gary R. Herbert, in his capacity as Lieutenant Governor of the State of Utah, Respondents.

Nos. 20070417, 20070407.

Supreme Court of Utah.

Aug. 21, 2007.

Clark Waddoups, Jeffrey J. Hunt, David C. Reymann, Cheylynn Hayman, Brinton R. Burbidge, Harold G. Christensen, Michael L. Deamer, Michael T. McCoy, Geoffrey W. Leonard, Patrick L. Tanner, Salt Lake City, Robert H. Chanin, John M. West, Jennifer L. Hunter, Washington, D.C., for petitioners.

Thom D. Roberts, M. Gay Taylor, Robert H. Rees, Salt Lake City, for respondents.

David R. Irvine, Alan L. Smith, Carol B. Lear, Janet I. Jenson, Jean Welch Hill, Salt Lake City, for amici.

WILKINS, Associate Chief Justice:

¶ 1 In February, during its 2007 general session, the Utah Legislature passed House Bill 148 entitled "Education Vouchers." By its terms, HB 148 creates a program under which scholarships may, in certain circumstances, be awarded to students who attend private school. The House passed HB 148 by a vote of thirty-eight to thirty-seven. Subsequently, HB 148 also passed the Senate and was signed into law by the Governor. Shortly after, before HB 148 became effective, the legislature also passed HB 174, entitled "Education Voucher Amendments," by more than a two-thirds majority in each chamber. By its terms, HB 174 purports to modify some of the provisions of HB 148.

¶ 2 In March, petitioner Carmen Snow, along with five other individuals, filed the necessary request with the Lieutenant Governor seeking a citizen referendum on HB 148. The Lieutenant Governor furnished them with a referendum petition in the form prescribed by law, which identified HB 148 as the subject of the proposed challenge. Snow and her colleagues became the official sponsors of the petition. They circulated the petition to acquire the requisite number of voter signatures to qualify the referendum for placement on the ballot and presentation to the voters. The petition said only that HB 148 had been enacted by the legislature and that the signers of the petition wished to have it placed on the ballot for voter approval. Once sufficient signatures were gathered and verified, the Lieutenant Governor alerted the Governor that the petition had been properly circulated and had sufficient voter signatures to require that HB 148 be placed before the voters. The Governor then set the date for the election.

¶ 3 By statute, once a legislative enactment has been successfully placed on the referendum track, it does not become effective until, and unless, approved by a majority of those voting on the referendum. Utah Code Ann. § 20A–7–301(2) (2003). Such was, and is, the fate of HB 148. However, since HB 174, the "Education Voucher Amendments" bill, passed both chambers of the legislature by a vote of more than two-thirds, it is not subject to voter referendum. Theoretically at least,

it was effective in due course after legislative passage and signature by the Governor.

¶ 4 As part of the statutorily mandated process of the referendum on HB 148, the Lieutenant Governor delivered a copy of the completed and verified petition to the Office of Legislative Research and General Counsel. It falls to the Legislative General Counsel to prepare a short and neutral descriptive explanation of the referendum petition to appear on the ballot as the title of the measure on which voters will be asked to cast their "for" or "against" vote. *Id.* § 20A–7–308 (2003). This "ballot title" is prepared in the Office of Legislative Research and General Counsel and delivered to the Lieutenant Governor. *Id.* The proposed ballot title prepared by the legislative counsel in this instance reads:

> Citizens' State Referendum
> Number 1 Ballot Title

> In February 2007, the Utah Legislature passed HB 148, Education Vouchers. This bill will take effect only if approved by voters. The bill:
> - establishes a scholarship program for:
>   - qualifying school-age children who newly enroll in eligible private schools; and
>   - lower income school-age children who continue their enrollment in eligible private schools;
> - provides for scholarships within that program of $500 to $3,000, depending on family size and income, increasing those scholarship amounts in future years; and
> - allows school districts to retain some per-student funding for scholarship students who transfer to private schools.

> Are you for or against HB 148 taking effect?

¶ 5 Oddly enough, it seems that no one was satisfied with the work of the legislative counsel. Both opponents and proponents of the educational voucher law felt that the ballot title failed to adequately inform the voters of the nature of the referendum upon which they were being asked to vote.

¶ 6 Senator Curtis Bramble, the majority leader of the Utah Senate and the Senate sponsor of HB 148, Representative Stephen Urquhart, the House sponsor, and others were the first to file a petition in this court challenging the language of the ballot title, asking that we revise it or, in the alternative, take the extraordinary step of cancelling the referendum election set by the Governor. The Bramble petitioners noted that the statute by which this court is authorized to tinker with the language of a ballot title appears to restrict to the sponsors of the referendum the opportunity to challenge the title's language. *Id.* § 20A–7–308. However, despite that impediment, they felt that the issue was of sufficient importance that we ought to resist the temptation to follow the statute to the letter, and consider their petition on the merits.

¶ 7 The Bramble petition named the Office of Legislative Research and General Counsel and the Lieutenant Governor as parties. The sponsors of the referendum were not included. The Office of Legislative Research and General Counsel and the Lieutenant Governor both responded, opposing the Bramble petition, and noting the lack of proper standing for the challenge to the ballot title language. A small flurry of other pleadings and motions followed.

¶ 8 A few days later, the referendum sponsors, Carmen Snow and others, also brought an action in this court challenging the wording of the ballot title. They named only the Office of Legislative Research and General Counsel as respondent party. Doing so, they created a circumstance under which the Bramble petitioners, as legislative sponsors of the challenged HB 148, were entitled to intervene and participate.

¶ 9 All parties urged the court to hear and decide the matter with all possible haste. Despite the fact that the election itself was nearly eight months distant, deadlines for submission of written voter information materials were imminent.

¶ 10 In order to avoid the necessity of resolving on their relative merits the pending motions and objections to the standing of the Bramble petitioners, with the attendant time-consuming and constitutionally guaranteed

notice and opportunity to be heard, we took the unsolicited step of consolidating the two petitions as a single matter. Doing so eliminated the legal difficulty relating to standing for the Bramble petitioners and allowed us to address the central questions raised by the parties without delay.

¶ 11 The referendum petition was declared "sufficient" by the Lieutenant Governor on April 30, 2007. The proposed ballot title was prepared and returned to him on May 15. Copies were then made available to the various interested parties. The first petition, filed by Senator Bramble and others, arrived at the court on May 24, 2007. The Snow petition was filed May 30, 2007. After giving the parties the necessary notice of our consolidation of the petitions, and allowing them minimal time to respond to positions raised by each other, we heard arguments from all concerned parties on June 8, 2007, and rendered our decision that same day from the bench. This opinion is the official recitation of that decision. As we noted at that time, we rarely announce a decision from the bench, and certainly not the same day as oral argument. Fortunately, the able and thorough work of counsel for all parties aided significantly in that effort.[1]

■ ¶ 12 Our state constitution limits the role of the supreme court. The legislative branch of government is charged with the declaration of policy, in response to the expressed wishes of citizens shown by the selection of their representatives and senators. The executive branch is charged with implementation of that policy. As he said in this case, the role of the Lieutenant Governor, like that of the other state-wide elected officers—the Governor, Attorney General,[2] Treasurer, and Auditor—is to apply the policy expressed in law by the legislature.

■ ¶ 13 Occasionally, the expression of state policy from our legislative branch is not as clear and understandable as they, or we as citizens, might hope. Such is the nature of the legislative process. However, when the policy and the intent of the legislature is unclear with respect to a particular enactment, it is to the judicial branch of state government that we turn for clarification. Usually, a question about the proper use or application of a statute enacted by the legislature is brought to the trial court as a starting point for resolution. This process allows all who may have a legitimate stake in the outcome of the proceeding to thoughtfully aid the court in reaching resolution, and for the issues and questions, should they persist and eventually reach the supreme court, to have been subjected to the careful review and critique of advocates for both sides, a trial judge and possibly a jury of citizens, and in most cases, three of our colleagues on the Utah Court of Appeals. This process, although sometimes lengthy, was calculated by the framers of our form of government to be most likely to produce a correct result.

¶ 14 In addition, when a case comes to us for review after that full process, we usually have not only the work of the lawyers and lower courts to help us understand, we also have the benefit of a period of weeks to review, consider, research, and resolve those questions before announcing a binding decision. This additional investment of time is

---

1. We do not knowingly delay the result in *any* matter presented to us for resolution. However, given our responsibility as the court of last resort on Utah law, we must always err on the side of trying to get the answer right, rather than simply getting it quickly. In this instance the issues were narrow and well presented and described clear alternatives. This, too, made it possible to expedite the decision.

2. In this instance, as in many others, the Attorney General was asked for his legal analysis and opinion on a question of state law. As the senior legal officer in the executive branch, the Attorney General issues opinions for the guidance of executive branch officers, agencies, and employees. In doing so, he often must act without specific guidance from this court. In this instance, the opinion of the Attorney General reached a different result from that reached by us regarding the seaworthiness of HB 174 as an independent vessel for the educational voucher program. Nothing of consequence should be attributed to that difference. As with any legal analysis, until a court of last resort speaks on an issue, reasonable and informed minds may well differ. As with the old saw, the supreme court is not last because we're always right, we're "right" because we're always last. Such is our constitutionally mandated system.

also designed to increase the likelihood of reaching legally correct and just results.

■ ¶ 15 Because it is the sponsors of the referendum that have the clear statutory right to seek modification of the ballot title language, we address first the claims and concerns of the sponsors. The Snow petitioners argue that the ballot title is patently false because it gives no clear indication of whether the referendum vote on HB 148 will prevent the implementation of a voucher program under HB 174. The Snow petitioners request that if we do not change the language of the ballot title, that we issue a writ indicating that HB 174, as a mere amendment to HB 148, is subject to the vote on HB 148 and cannot stand on its own. Although we agree with that analysis, a writ is not an appropriate vehicle for that indication.

¶ 16 The Bramble petitioners also argue that the ballot title is patently false. They claim that HB 148 was superseded by HB 174, and, therefore, HB 148 ceased to exist for purpose of referendum, except as to those sections which were not reenacted by HB 174. The Bramble petitioners ask us to clarify that HB 174 can stand on its own, and as such, that any referendum vote on HB 148 would not prevent the implementation of the voucher program.

■ ¶ 17 The Utah Constitution allows the citizens of Utah a direct hand in rejecting or modifying the handiwork of the legislative branch. An initiative petition offers an avenue for voters to create statutory law without the participation of the legislature. On the other hand, a referendum petition is for the sole purpose of giving voters the opportunity to accept or reject a specific legislative enactment. When either of these direct citizen legislative actions occurs, it is to the ballot that the matter is finally directed. In the case of a referendum petition, citizens who vote are given a choice to accept or reject the challenged legislative action.

¶ 18 The process by which this vote is accomplished specifies in detail the responsibilities of the participants in that process. It falls to the legislative staff, specifically the Office of Legislative Research and General Counsel, the legislature's lawyers, to craft a statement of what the voter is being asked to decide. That statement, the ballot title, is carefully restricted by law to avoid any inadvertent or intentional slanting of the information that will appear on the ballots distributed to voters and reproduced in information sent to voters by the state. Utah Code Ann. § 20A–7–308.

¶ 19 By law, the legislative legal staff is required to produce a statement, the ballot title, that is an impartial summary of the contents of the referendum. *Id.* § 20A–7–308(2)(a)(ii). The title may not exceed one hundred words. *Id.* § 20A–7–308(2)(b). Once prepared, the ballot title is distributed to the referendum sponsors and other interested persons. *Id.* § 20A–7–308(3). The sponsors have fifteen days from the day the Lieutenant Governor mails the title to them within which to challenge the wording. *Id.* § 20A–7–308(4)(a)(i). That is what the Snow petitioners, as the sponsors of the referendum, have done.

¶ 20 The challenge to the language of a ballot title comes directly here. However, that challenge comes with strings attached. The legislature, as is their duty under our constitution, has set the policy for how these challenges are to be resolved. The supreme court is required to examine the ballot title, hear arguments from the directly interested parties, and within five days of reaching our decision, send the Lieutenant Governor a ballot title that impartially summarizes the referendum issue on the ballot. *Id.* § 20A–7–308(4)(c).

■ ¶ 21 In addition, we are restricted in the scope of our review. We are required by law to presume that the ballot title prepared by the legislative staff is an impartial summary. *Id.* § 20A–7–308(4)(b)(i). We are not permitted to change the wording of the ballot title unless we are clearly convinced by the sponsors that the ballot title is either "patently false" or "biased." *Id.* § 20A–7–308(4)(b)(ii). It is not within our statutory grant of authority to modify the ballot title because we think there may be a better or more clearly stated way of putting it. The fact that all the world may be confused by a proposed ballot title, alone, is also not enough. To modify the language, we must

find, by the heightened standard of proof, that the proposed title is clearly false or clearly biased.

¶ 22 However, in addition to our limited statutory grant of authority and responsibility relating to false or biased ballot titles, we also have the authority granted us by the people of Utah under the constitution. That power is somewhat more extensive. And it is to that broader power that all of the parties appeal, in the event we do not agree with their particular application of the ballot title statutory authority.

¶ 23 While there are any number of reasons to reject the suggestion that we move beyond our limited ballot title review, there are also significant reasons urging our further action. Because we find no patent falsity or clear bias in the ballot title presented by the Office of Legislative Research and General Counsel, we need not strain to reach an accommodation between the clear restrictions of the statute and the desire of the parties that we exceed those restrictions in this instance.

■■ ¶ 24 On the other hand, it is within our broader grant of constitutional power to review and render a decision on the efficacy of an enacted and existing statute. This is particularly meaningful in an instance, such as this, where the scope of that statute is central to completing our assigned task of reviewing the claims of falsity related to ballot title language. Both petitions urge claims of falsity based upon an alleged failure of the legislative counsel to include comments regarding HB 174 in the ballot title. To evaluate those claims, we must first understand the impact of HB 174 on HB 148, if any, and the converse. HB 174 was passed by both houses of the legislature and signed into law by the governor. As such, whatever its effect, it is on our books and is a presently existing statute. The petitioners in both of the consolidated cases also urge us to review the status of HB 174 in their alternative petitions for extraordinary writs. In addition, in order to determine whether or not the petitioners have made out a clear and convincing case that the ballot title is defec-

tive, we must consider, and understand, what HB 174 does.

¶ 25 Consequently, we turn first to HB 174, "Education Voucher Amendments." At first reading, the substantive provisions contained in HB 174 appear to contain enough to stand alone as the creation of a school voucher program. However, the language of the bill itself suggests otherwise. First, key terms defined in HB 148 are not defined in HB 174, such as "board" and "income eligibility guideline." These two terms, used frequently in the statute, may well be subject to eventual interpretation. However, their definition in HB 148, and absence in HB 174, strongly suggests that the "Education Voucher Amendments" bill was meant to actually amend, and not to replace, HB 148. Second, unlike HB 148, HB 174 received no appropriation to implement an education voucher program. This $12,000,000 difference also strongly suggests the two enactments were meant to be a single whole.

¶ 26 Finally, HB 174 contains a coordinating provision, unlike HB 148. The coordinating clause expresses the intent that "[i]f this HB 174 and HB 148, Education Vouchers, both pass, it is the intent of the Legislature that the amendments to the sections in this bill supersede the amendments" to the corresponding provisions in HB 148. This language could be read to mean that whichever of the bills passes, if not both, will control. It can also be read to mean that if HB 174 passes, it controls over the existing provisions of HB 148. Tellingly, at the time HB 174 was introduced in the legislature, HB 148 had already passed both houses and been signed into law by the governor. Therefore, it is illogical to suggest that the intent was to allow whichever bill became law to control, since HB 148 already was law.

¶ 27 These indications lead us to the conclusion that HB 174 was intended by the legislature to amend HB 148, not supplant it. At the time of passage, HB 174 was not intended to be a stand-alone substitute for HB 148. Although that could have been done by the legislature, it was not done in this instance.[3]

3. Parties have directed our attention to state-    ments made in the course of debate and enact-

¶ 28 HB 174 does not stand alone, and must have HB 148 to amend if it is to have any legal consequence at all. If the voters choose to reject HB 148, HB 174 will not create an additional voucher program. If the voters choose to accept HB 148, the amendments of HB 174 will automatically be applied.

¶ 29 With this legal relationship resolved, we turn to the challenged ballot title. As prepared by the Office of Legislative Research and General Counsel, the ballot title reads:

### Citizens' State Referendum Number 1 Ballot Title

In February 2007, the Utah Legislature passed HB 148, Education Vouchers. This bill will take effect only if approved by voters. The bill:

- establishes a scholarship program for:
  - qualifying school-age children who newly enroll in eligible private schools; and
  - lower income school-age children who continue their enrollment in eligible private schools;
- provides for scholarships within that program of $500 to $3,000, depending on family size and income, increasing those scholarship amounts in future years; and
- allows school districts to retain some per-student funding for scholarship students who transfer to private schools.

Are you for or against HB 148 taking effect?

¶ 30 The petitioners in both cases before us base any claim that the ballot title is patently false on the absence of interpretive references to HB 174. As we have noted above, interpretive references in the ballot title would have been improper in this instance. As a result, the parties have not persuaded us that anything in the ballot title is inaccurate, much less patently false. The law requires us to conclude that something meaningful in the ballot title is patently false

or biased if we are to modify the language in any way. Utah Code Ann. § 20A-7-308(4)(b)(ii). We conclude that nothing in the ballot title is substantively false; nothing in the ballot title suggests bias; and nothing need be added to reflect the impact of HB 174.

### CONCLUSION

¶ 31 We find nothing in the work of the Office of Legislative Research and General Counsel suggesting any intentional or even inadvertent bias. Further, the ballot title prepared by Ms. Taylor and her legal staff appears to accurately and correctly reflect the precise nature and content of the ballot referendum submitted to the Lieutenant Governor. HB 174, the educational voucher amendments measure, passed by more than two-thirds vote of each house of the legislature and is not subject to referendum. It is not addressed by the proposed ballot title, nor would it properly be.

¶ 32 We also conclude that HB 174, "Educational Voucher Amendments," is dependent upon HB 148, "Educational Vouchers," for meaning. It is the clearly expressed intent of the legislature that the provisions of HB 174 modify the provisions of HB 148. Should HB 148 be rejected by the voters under the referendum, HB 174 would be without legal meaning. Specifically, we conclude that HB 174 was not intended by the legislature to stand alone as an independent act creating an educational voucher program, and therefore it does not. Although HB 174 is not subject to referendum by the voters, it is subject to the consequences of the referendum on HB 148.

¶ 33 The challenges to the ballot title are rejected on their merits. The petitions for extraordinary writs are also denied on their merits.

¶ 34 We express gratitude to the parties and their counsel for the professional and excellent way in which this matter has been handled, notwithstanding the demands placed upon them.

---

ment of HB 174 that appear to support our conclusion. However, since we find the language of the bill itself sufficient to reach that conclusion, we need not reach the legislative history.

¶ 35 Justice DURRANT, Justice PARRISH, and Justice NEHRING concur in Associate Chief Justice WILKINS' opinion.

¶ 36 Having disqualified herself, Chief Justice DURHAM does not participate herein.