2012 UT 2

**Clint CARTER, Melvin P. Anderson, and Kenneth Greenwood, Petitioners,**

v.

**LEHI CITY and Marilyn Banasky, Lehi City Recorder, Respondents.**

No. 20110482.

Supreme Court of Utah.

Jan. 10, 2012.

John L. Valentine, Provo, for petitioners.

J. Craig Smith, Daniel J. McDonald, Kathryn J. Steffey, R. Christopher Preston, Salt Lake City, Kenneth A. Rushton, Lehi, for respondents.

Justice LEE, opinion of the Court:

¶ 1 This case presents questions concerning the scope of the people's initiative power under article VI of the Utah Constitution. Petitioners are Lehi City voters who sought to place on the municipal ballot initiatives regulating salaries and residency require-

ments for certain city employees. The City refused to accept the initiatives, and this litigation ensued.

¶ 2 Our consideration of this matter has caused us to reexamine our precedents defining the nature and extent of the people's power to legislate by initiative. The framework embraced in those precedents has prompted some misgivings over the years. At the core of our concern has been the difficulty of applying the test in our cases predictably and consistently.[1]

¶ 3 This concern is particularly troubling in a field that implicates the constitutional power of the people to initiate legislation. That power is a fundamental guardian of liberty and an ultimate protection against tyranny. Its preservation cannot be left to the whims of a doctrine whose invocation turns on the discretionary decrees of the judicial branch. Of all the branches of government, we are least suited to decide on the wisdom of allowing the people to supplant their representatives in a particular field of regulation. We are the least representative branch of government. There is a troubling irony in our making discretionary calls on the propriety of acts by the ultimate repository of regulatory power. We must assure that our decisions on such vital matters are dictated by law, not by our individual preferences.

¶ 4 With this in mind, we return to first principles to examine the nature and scope of the people's initiative power. In the paragraphs below, we evaluate the text and structure of article VI of the Utah Constitution and analyze its meaning in historical perspective. From those materials we develop a legal framework for delineating the people's initiative power that is consistent with the text and original meaning of article VI.

¶ 5 This page of history outweighs the volume of logic in our existing precedent. Thus, we abandon the framework set forth in *Citizen's Awareness Now v. Marakis*, 873 P.2d 1117 (Utah 1994), and refined in subsequent cases, replacing it with a standard that defines the people's initiative power on the basis of the nature of the power to effect "legislation," as that term is traditionally understood.

■ ¶ 6 In so doing, we do not envision a fundamental change in the ultimate breadth of the initiative power. Our new framework is not aimed at overturning the results of most of our prior decisions in this area. We aim to clarify the law and to bring it in line with the text and original meaning of the constitution, not to overrule the results of many of our cases. Thus, our decision today is sensitive to and ultimately consistent with the doctrine of stare decisis. That doctrine recognizes that "people should know what their legal rights are as defined by judicial precedent, and having conducted their affairs in reliance on such rights, ought not to have them swept away by judicial fiat." *Austad v. Austad*, 2 Utah 2d 49, 269 P.2d 284, 290 (1954). A decision to clarify unworkable precedent does not undermine but advances that goal, particularly where we preserve the results of most of our prior cases. *See id.*

¶ 7 Applying our new standard, we uphold the initiatives proposed by petitioners as properly legislative and reject Lehi City's various objections to placing them on the ballot.

I

¶ 8 In December 2010, a group of Lehi City voters sought to amend two city ordinances by submitting to the city recorder two voter initiatives for inclusion in the 2011 municipal election ballot. Initiative One sought to set "maximum salary and total compensation limits" on all salaried city employees. Initiative Two sought to impose a city residency requirement for certain city employees. Each initiative garnered more than the minimum number of registered voter signa-

---

1. *See Friends of Maple Mountain, Inc. v. Mapleton City*, 2010 UT 11, ¶ 8, 228 P.3d 1238 ("While this black letter rule is easily stated, in practice it has proven difficult to distinguish between legislative and administrative actions."); *Citizen's Awareness Now v. Marakis*, 873 P.2d 1117, 1122 (Utah 1994) (discussing the need to clarify the "difficult" question whether a zoning amendment is "legislative or administrative in nature"); *Wilson v. Manning*, 657 P.2d 251, 257 (Utah 1982) (Howe, J., dissenting) (asserting that "considerable clarification is needed" in defining the boundary between legislative and administrative acts).

tures required by statute,[2] and it is undisputed that the initiatives otherwise complied with title 20A, chapter 7 of the election code, which governs the manner and conditions for proposing citizen initiatives.

¶ 9 In a May 2011 council meeting, the Lehi City Council determined that the proposed amendments were not valid exercises of the voters' power to initiate legislation, and adopted a resolution directing the city recorder to refuse to place them on the November 2011 election ballot. The resolution stated the council's conclusions that "both initiatives are legally insufficient in that they: i) are not the proper subject of an initiative petition because they are administrative in nature; ii) may be an unconstitutional impairment of contract; [and] iii) conflict with state law."

¶ 10 Upon learning of the council's decision, three of the initiatives' sponsors filed a petition for writ of extraordinary relief directly in this court as authorized by Utah Code section 20A–7–507. The petitioners contend that Initiatives One and Two are proper exercises of initiative power under article VI of the Utah Constitution and that the initiatives should be submitted for voter approval in the next municipal election. We agree with the petitioners: The subject matter of Initiatives One and Two is legislative in nature; the initiatives do not conflict with state law because Utah Code section 10–3–818, invoked by the City, does not apply to voter initiatives; and the City's remaining arguments are not ripe for review.

## II

¶ 11 Lehi City raises a threshold timing issue. The City notes that under Utah Code section 20A–7–507(5)(a), a voter petition for an extraordinary writ on an initiative is due "within 10 days after the refusal" of the initiative by the "local clerk." Because the Lehi City Recorder refused the proposed initiatives in a letter dated May 18, 2011, the City contends that the extraordinary writ was due by statute on June 2, 2011, and was thus untimely when filed one day later on June 3.

¶ 12 In calculating the petition's statutory due date, the City counts only business days, as provided by Utah Rule of Appellate Procedure 22(a), but does not add three additional days based on the use of the mail for service, as sometimes called for by Utah Rule of Civil Procedure 6(e). The timeliness of petitioner's filing turns on the applicability of this latter provision. If the three-day addition contemplated by rule 6(e) applies here, the petition in this case was timely. Otherwise, it was late and subject to dismissal.

¶ 13 By its terms, rule 6(e) has no application here. It adds three days only for filings required "within a prescribed period after the service of a notice or other paper upon [the party]" and only if "the notice or paper is served . . . by mail." Utah R. Civ. P. 6(e). The extraordinary writ at issue here is not such a filing, as it is required not "within a prescribed period *after the service* of a notice or other paper," but within a prescribed period after a certain action (refusal of the initiative). Rule 6(e)'s three-day addition, in other words, is properly invoked only where the time period is triggered by service, and not by some other action.[3] Because the ten-day period in the statute at issue here is triggered by the city recorder's refusal, and not service of notice of the refusal, there is no basis in rule 6(e) for adding three days to the filing deadline.

¶ 14 Applying that interpretation to this case would result in dismissal of the petition as untimely. Petitioners note, however, that this approach is inconsistent with our decision in *Low v. City of Monticello,* 2002 UT 90, 54 P.3d 1153. *Low* asserted, without analysis, that rule 6(e) extended the ten-day period under section 20A–7–

---

2. *See* Utah Code § 20A–7–501(1)(a)(ii) (2010).

3. *See, e.g., Maverik Country Stores, Inc. v. Indus. Comm'n,* 860 P.2d 944, 949 (Utah Ct.App.1993) (explaining that rule 6(e) does not apply when the "time for appeal runs from the issuance of an order not from the service of an order on a party"); *see also Flint v. Howard,* 464 F.2d 1084, 1087 (1st Cir.1972) (holding that Federal Rule of Civil Procedure 6(e) does not add three days to a time period that "begins to run from 'entry of judgment' rather than from receipt of notice").

507(5)(a). *Id.* ¶¶ 17–18. In light of *Low,* petitioners contend that their filing should be deemed timely, regardless of the contrary conclusion suggested by the plain language of rule 6(e).

¶ 15 We overrule *Low* insofar as it adopted a construction of rule 6(e) that is contrary to its text. Rule 6(e) has no application to the ten-day filing requirement for extraordinary writs under section 20A–7–507(5)(a), as the statutory period is triggered by *refusal* of an initiative and not its *service* to a party. We apply our holding only prospectively, however, in recognition of petitioner's reasonable reliance on the *Low* opinion. *See Merrill v. Utah Labor Comm'n,* 2009 UT 74, ¶ 5, 223 P.3d 1099 (court may foreclose "retroactive operation of [a] ruling where [an] overruled law has been justifiably re lied upon" (internal quotation marks omitted)). Litigants ought to be able to rely on our constructions of our rules and statutes, particularly on matters as critical as the timing standards for filing deadlines. Thus, we do not extend our holding on this issue to the petitioners in this case, as they were entitled to rely on our opinion in *Low* and should not be punished for accepting it as con trolling so long as it stood unreversed.

### III

¶ 16 Lehi City's central contention is that Initiatives One and Two are "administrative in nature" and thus not "appropriate for voter participation." We disagree with Lehi and hold that Initiatives One and Two are proper exercises of the people's legislative power.

¶ 17 Article VI, section 1 of the Utah Constitution vests "Legislative power" in "the people of the State of Utah" and provides for its exercise through ballot initiatives and referenda. Under this provision, our cases have long recognized a general limit on the people's initiative power. An initiative is appropriate if it is "legislative," but *ultra vires it* it is "administrative." *Citizen's Awareness Now v. Marakis,* 873 P.2d 1117, 1122 (Utah 1994).[4] This legislative/administrative distinction is a reflection of our constitution's explicit and strict separation of powers, which is set forth in article V.

¶ 18 Under article V of the Utah Constitution,

> The powers of the government of the State of Utah shall be divided into three distinct departments, the Legislative, the Executive, and the Judicial; and no person charged with the exercise of powers properly belonging to one of these departments, shall exercise any functions appertaining to either of the others, except in the cases herein expressly directed or permitted.[5]

Article VI, section 1 creates one of these "three distinct departments"—the "Legislative Department"—and as we have said, also vests legislative power in the people. When the people initiate legislation through article VI, they act as a body "charged with the exercise of powers properly belonging to" the Legislative Department. In this role, the people are prohibited by article V from "exercis[ing] any functions appertaining to either" the Executive or Judicial Departments. Accordingly, the executive and judicial powers are not available to the people in the initiative process. Stated another way, the people may initiate legislation, but they lack the authority to execute the law or to adjudicate it. In this sense, "administrative" does not mean ministerial or unimportant; it simply refers to executive power. The true limit on voter initiatives, then, is that they must be

---

4. *See also Friends of Maple Mountain, Inc. v. Mapleton City,* 2010 UT 11, 228 P.3d 1238; *Low v. City of Monticello,* 2002 UT 90, 54 P.3d 1153; *Wilson v. Manning,* 657 P.2d 251 (Utah 1982); *Bird v. Sorenson,* 16 Utah 2d 1, 394 P.2d 808 (1964); *Shriver v. Bench,* 6 Utah 2d 329, 313 P.2d 475 (1957); *Keigley v. Bench (Keigley II),* 97 Utah 69, 89 P.2d 480 (1939); *Keigley v. Bench (Keigley I),* 90 Utah 569, 63 P.2d 262 (Utah 1936).

5. UTAH CONST. art. V, § 1. Unlike the U.S. Constitution, our state constitution explicitly prohibits sharing powers among the branches, at least with regard to powers deemed "primary, core, or essential" to a particular branch of government. *In re Young,* 1999 UT 6, ¶ 14, 976 P.2d 581 (internal quotation marks omitted).

a valid exercise of legislative rather than executive or judicial power.[6]

¶ 19 In the following sections, we (a) elaborate on our conclusion that the people and the legislature hold parallel and coextensive legislative power; (b) describe the nature and limits of legislative power; (c) articulate a general test for distinguishing proper uses of legislative power in ballot initiatives; (d) examine the effects of this new standard on our prior cases in this area; and (e) apply our new standard to the initiatives in this case, concluding that both initiatives are proper exercises of legislative power.

### A

¶ 20 We begin with some fundamental principles that are evident in the text, structure, and history of our constitution. First, the initiative power of the people is parallel to and coextensive with the power of the state legislature.[7] Second, the constitution accords a similar initiative power to the people on a local level, to be exercised within counties, cities, and towns.[8] From these principles, it follows that the question courts should ask in evaluating the propriety of a proposed initiative is whether the initiative would be a proper exercise of legislative power if enacted by the state legislature.

### 1

¶ 21 "The government of the State of Utah was founded pursuant to the people's organic authority to govern themselves."[9] As reinforced in our constitution, "[a]ll political power is inherent in the people; and all free governments are founded on their authority." Utah Const. art. I, § 2. Under this basic premise, upon which all our government is built, the people have the inherent authority to allocate governmental power in the bodies they establish by law.

¶ 22 Acting through the state constitution, the people of Utah divided their political power, vesting it in the various branches of government. Article VI vests "The Legislative power of the State" in two bodies: (a) "the Legislature of the State of Utah," and (b) "the people of the State of Utah as provided in Subsection (2)." Id. art. VI, § 1(1). On its face, article VI recognizes a single, undifferentiated "legislative power," vested both in the people and in the legislature. Nothing in the text or structure of article VI suggests any difference in the power vested simultaneously in the "Legislature" and "the people."[10] The initiative power of the people is thus parallel and coextensive with the power of the legislature. This interpretation is reinforced by the history of the direct-democracy movement, by constitutional debates in states with constitutional provisions substantially similar to Utah's article VI, and by early judicial interpretations of those provisions.

¶ 23 Utah amended its constitution to provide for ballot initiatives in 1900, the second

---

**6.** See, e.g., *Keigley I*, 63 P.2d at 265 (discussing executive and legislative power).

**7.** See, e.g., *Gallivan v. Walker*, 2002 UT 89, ¶ 23, 54 P.3d 1069 ("The power of the legislature and the power of the people to legislate through initiative and referenda are coequal, coextensive, and concurrent...." (internal quotation marks omitted)).

**8.** *Sevier Power Co. v. Bd. of Sevier Cnty. Comm'rs*, 2008 UT 72, ¶ 10, 196 P.3d 583 (concluding that municipal initiative power extends to *"any substantive topic* and *any legislative act,* unless otherwise forbidden by the constitution").

**9.** *Gallivan*, 2002 UT 89, ¶ 22, 54 P.3d 1069; *see also Utah Power & Light Co. v. Provo City*, 94 Utah 203, 74 P.2d 1191, 1205 (1937) (Larson, J., concurring) ("[A]*ll political power is inherent in the people* and within their own constitutional bailiwick they determine public and legislative

policy."); *City of Eastlake v. Forest City Enters.*, 426 U.S. 668, 672, 96 S.Ct. 2358, 49 L.Ed.2d 132 (1976) ("Under our constitutional assumptions, all power derives from the people, who can delegate it to representative instruments which they create."); The Federalist No. 39 (James Madison) ("[W]e may define a republic to be, or at least may bestow that name on, a government which derives all its powers directly or indirectly from the great body of the people....").

**10.** In fact, in some sense the people's initiative power may have "superior advantages" to the legislature's power. *See Utah Power & Light*, 74 P.2d at 1202 (Larson, J., concurring) ("[T]he legislative power of the people directly through the ballot is superior to that of the representative body.... Bear in mind that the Constitution vests the Governor with veto power on acts of the Legislature, but he has no veto power on legislation enacted by the people through the initiative.").

of twenty-four states to do so.[11] At the time, a Progressive movement had gained widespread support, based on the premise that "only free, unorganized individuals could be trusted and that any intermediary body such as politicians, political parties and legislative bodies were inherently corrupt and distorted the public interest."[12] The thrust of the initiative movement was a sentiment that the people should flex the muscles of their organic governmental power and reserve for themselves the legislative power that had previously been vested solely in the state legislatures.[13] Only by wielding the legislative power could the people govern themselves in a democracy unfettered by the distortions of representative legislatures.[14]

¶ 24 The Progressive movement's nationwide force impelled many states to consider constitutional amendments that provided for direct democracy in the form of initiatives and referenda.[15] These debates addressed the nature of the legislative power that would be exercised directly by the people. Although the legislative history of Utah's initiative amendment is limited, the debates in other states inform the scope of the people's legislative power as it was originally understood.

¶ 25 For example, throughout the debates in Massachusetts and Ohio, delegates acknowledged that the people are the ultimate source of sovereign power [16] and spoke of the initiative amendments as reservations of the same power delegated to the legislature.[17] Indeed, the delegates took for granted that the governmental power to be reserved by the people was legislative power and focused their arguments on the wisdom of sharing that power between the people and the legislature.[18]

¶ 26 The adoption of initiative and referendum amendments raised questions in many state courts regarding the power allocated between the people and the legislature. In early judicial interpretations of article VI and similar constitutional provisions in other states, courts generally understood that the people and the legislature hold parallel and coextensive power.

¶ 27 In one of the first Utah cases interpreting article VI, Justice Larson explained that through ballot initiative, the people are a "legislative body coequal in power" with the legislature. *Utah Power & Light Co. v. Provo City*, 94 Utah 203, 74 P.2d 1191, 1205 (1937) (Larson, J., concurring). The Supreme Court of Washington stated that

11. THOMAS E. CRONIN, DIRECT DEMOCRACY: THE POLITICS OF INITIATIVE, REFERENDUM AND RECALL 51 (1989).

12. Robert H. Freilich & Derek B. Guemmer, *Removing Artificial Barriers to Public Participation in Land–Use Policy: Effective Zoning and Planning by Initiative and Referenda*, 21 URB. LAW. 511, 516 (1989).

13. Cronin, *supra* note 11, at 59.

14. *Id.*

15. *See* 2 DEBATES IN THE MASSACHUSETTS CONSTITUTIONAL CONVENTION 1917–1918, THE INITIATIVE AND REFERENDUM 17 (1918) [hereinafter MASSACHUSETTS DEBATES] (statement of Joseph Walker) ("This Convention is here ... I take it, in response to the progressive spirit that is surging in this Commonwealth of Massachusetts, and not here alone but throughout the country.").

16. *See id.* at 229 (statement of William S. Kinney) (noting that "the principle that all power in a democracy rests primarily with the people[,] ... the source of all power," is one "with which nobody finds fault, and with which we all agree"); 1 PROCEEDINGS AND DEBATES OF THE CONSTITUTIONAL CONVENTION OF OHIO 679 (1912) [hereinafter OHIO DEBATES] (statement of Joe De Frees) ("No man here denies that all powers are derived from the people, [and] that the people have delegated these powers [to the legislature]....").

17. *See* MASSACHUSETTS DEBATES, *supra* note 15, at 409 (statement of Thomas J. Boynton) ("Conditions, not unfamiliar, in many American States, have rendered it absolutely essential that the people ... reserve power to themselves ... to initiate laws ..." (quoting California Senator Hiram W. Johnson)); OHIO DEBATES, *supra* note 16, at 674 (statement of Robert Crosser) ("[The amendment] simply provides for the legislative power of the state; that it shall be vested in a general assembly ..., and it also provides that the people reserve to themselves the power to propose laws....").

18. *See* MASSACHUSETTS DEBATES, *supra* note 15, at 9 (minority re port of the Committee on the Initiative and Referendum) ("Here is a question not of principle but of wisdom and expediency: Will the [initiative] ensure a truer expression of the public will than the action of [the legislature]?" (capitalization altered)); OHIO DE bates, *supra* note 16, at 672–89 (discussing the wisdom of initiative and referendum amendment).

"[t]he passage of an initiative measure as a law is the exercise of the same power of sovereignty as that exercised by the Legislature in the passage of a statute." *Love v. King Cnty.*, 181 Wash. 462, 44 P.2d 175, 178 (1935). Likewise, soon after becoming the first state to pass an initiative amendment, the North Dakota Supreme Court recognized that "the Legislative Assembly and the people are in effect coordinate legislative bodies with coextensive legislative power." *State v. Houge*, 67 N.D. 251, 271 N.W. 677, 680 (1937). And the Oregon Supreme Court, explaining that the initiative power is parallel to the legislature's power, stated that "[l]aws proposed and enacted by the people under the initiative ... are subject to the same constitutional limitations as other statutes, and may be amended or repealed by the Legislature at will." *Kadderly v. City of Portland*, 44 Or. 118, 74 P. 710, 720 (1903).[19]

### 2

¶ 28 The people's legislative power may be exercised at either a statewide or local level. Article VI, section 1(2) distinguishes statewide and local initiatives but affirms that the initiative power at both levels is coextensive with the power vested in the legislature.

¶ 29 Under subsection (2)(a), "legal voters of the State" are authorized to "initiate *any desired legislation* and cause it to be submitted to the people for adoption," subject only to the "conditions," "manner," and "time provided by statute." UTAH CONST. art. VI, § 1(2)(a) (emphasis added). Subsection (2)(b) recognizes parallel power of "legal voters of any county, city, or town"—to "initiate *any desired legislation* and cause it to be submitted to the people of the county, city, or town for adoption," again subject only to the "conditions," "manner," and "time provided by statute." *Id.* § (2)(b) (emphasis added).

¶ 30 These two provisions recognize a relatively unlimited legislative power reserved by the people. Whether on a statewide or local basis, the people may propose any measure that is "desired"—so long as it is "legislation," and so long as the people follow the conditions and manner prescribed by statute. And though the legislature may prescribe the "manner" and "conditions" for exercising initiative power, article VI nowhere indicates that the scope of the people's initiative power is less than that of the legislature's power, or that the initiative power is derived from or delegated by the legislature. Instead, "[u]nder our constitutional assumptions, all power derives from the people, who can delegate it to representative instruments which they create." *City of Eastlake v. Forest City Enters.*, 426 U.S. 668, 672, 96 S.Ct. 2358, 49 L.Ed.2d 132 (1976).[20] Therefore a "referendum [or initiative] cannot ... be characterized as a delegation of power." *Id.* And in exercising the initiative power, the people do not act under the authority of the legislature.[21]

¶ 31 Yet while article VI, subsection (2) authorizes the people to exercise their full legislative power by proposing "any desired

19. *See also* 59 C.J. *Statutes* § 233 (1932) ("Through the initiative the people are a coordinate legislative body with co-extensive legislative power, exercising the same power of sovereignty in passing upon measures as that exercised by the legislature in passing laws. Statutes enacted by the people directly under the initiative are of equal dignity with those passed by the legislature, ... [and] when acting as a legislative body the people can no more transgress the constitution than can the legislative assembly...." (footnotes omitted)).

20. *See also Utah Power & Light*, 74 P.2d at 1205 (Larson, J., concurring) ("But the people themselves are not creatures or creations of the Legislature. They are the father of the Legislature, its creator, and in the act creating the Legislature the people provided that its voice should never silence or control the voice of the people in whom is inherent all political power; and being coequal in legislative power, the Legislature, the child of the people, cannot limit or control its parent, its creator, the source of all power.")

21. The "manner and conditions" clause acts merely as a control on initiative procedure, not as a substantive limitation on the legislative power of the people or as a delegation of legislative power to the people. *Sevier Power Co.*, 2008 UT 72, ¶ 10, 196 P.3d 583 ("The authority of the legislature to set conditions on the exercise of the initiative power by the people ... is limited ... to the role of providing for the orderly and reasonable use of the initiative power. It does not follow, logically or constitutionally, that the authority to set limits on *conditions, manner,* or *time* gives the legislature the broader authority to [set substantive limits on the initiative power].").

legislation," its division between statewide and local authority necessarily implies a geographical limit on local initiative power. The voters of a municipality could not adopt, for example, a statewide traffic law. Otherwise, however, the people's legislative power is the same—and is coextensive with the power delegated to the legislature—regardless of whether that power is wielded on a statewide or local level.[22] Therefore, when courts must determine the propriety of a voter initiative, the relevant inquiry must look to the nature and limits of legislative power. The people's initiative power reaches to the full extent of the legislative power, but no further.

B

¶ 32 The conclusion that the people hold retained, coextensive power to adopt "legislation" leaves unresolved the question of the nature and extent of the legislative power. It may not be possible to mark the precise boundaries of that power with bright lines.[23] But we can describe the essential hallmarks of such power, and in so doing we can prescribe a working standard for judging the propriety of ballot initiatives under the Utah Constitution.

¶ 33 The starting point in our analysis is the constitutional separation of legislative, executive, and judicial powers. *See* UTAH CONST. art. V. Our understanding of the legislative power is informed by its placement in relation to—and separation from—the executive and judicial power. Thus, we proceed to identify the hallmarks of legislative power and to describe its boundaries in part by its separation from the executive and the judicial power.

¶ 34 In the paragraphs that follow, we identify two key hallmarks of legislative power as it has historically been understood.

Legislative power generally (a) involves the promulgation of laws of general applicability; and (b) is based on the weighing of broad, competing policy considerations. This power is different from the executive power, which encompasses prosecutorial or administrative acts aimed at applying the law to particular individuals or groups based on individual facts and circumstances. It is also distinguished from the judicial power, which involves the application of the law to particular individuals or groups based on their particularized circumstances.

¶ 35 After elaborating these elements of the legislative power (as informed by its executive and judicial counterparts), we proceed below to identify traditional examples of each. The examples are offered in recognition of the difficulty of delineating the legislative power with clear, bright lines. Because those lines are somewhat fuzzy, in other words, we offer examples to illustrate with historical pictures what we cannot describe precisely in words.

1

¶ 36 The legislative power is first defined by the work product it generates. When the government legislates, it establishes rules of general applicability. Such rules are ones that apply to everyone who engages in the type of conduct that the law addresses: "When a legislative body, whether of the state or of a local government, enacts a statute or an ordinance, that law applies to everyone within the geographical area over which that body has jurisdiction" or to everyone within a "category of persons engaged in a particular activity." *Univ. of Utah v. Shurtleff,* 2006 UT 51, ¶ 25, 144 P.3d 1109.[24] A "generally applicable rule," in oth-

**22.** *See Utah Power & Light,* 74 P.2d at 1205 (Larson, J., concurring); *see also id.* at 1199 (Wolfe, J., plurality opinion) (describing Justice Larsen's view that an initiative by the people of a municipality that "affect[s] only their governmental unit is just as efficacious in that field as is the action of all the people of the state in the matter of legislation in the field in which they act").

**23.** *See Fletcher v. Peck,* 10 U.S. (6 Cranch) 87, 136, 3 L.Ed. 162 (1810) ("How far the power of

giving the law may involve every other power, in cases where the constitution is silent, never has been, and perhaps never can be, definitely stated.").

**24.** *Cf. Fasano v. Bd. of Cnty. Comm'rs,* 264 Or. 574, 507 P.2d 23, 27 (1973) ("[Legislative] action produces a general rule or policy which is applicable to an open class of individuals, interest, or situations, [whereas executive or judicial power applies] a general rule or policy to specific individuals, interests, or situations."), *disapproved of*

er words, sets the governing standard for all cases coming within its terms.[25]

¶ 37 This hallmark of legislative power can be highlighted by contrasting this power with its executive and judicial counterparts. Once a general rule is established by the legislature, its enforcement is left to the executive (by applying it to the particularized circumstances of individuals, through functions like prosecution or licensing)[26] and its adjudication is left to the judiciary (by resolving specific disputes between parties as to the applicability of the law to their actions).

¶ 38 The legislative power is also defined by the nature of legislative decision-making. When government legislates, it weighs broad policy considerations, not the specific facts of individual cases. "Simply stated, legislative powers are policy making powers, while executive powers are policy execution powers." *Martindale v. Anderson,* 581 P.2d 1022, 1027 (Utah 1978).[27] Thus, in adopting rules of general applicability, the legislature considers the wide range of policy considerations of relevance to all who fall within the scope of a particular law.

¶ 39 These features of the legislative power have deep historical roots. Over two hundred years ago, Chief Justice John Marshall explained that "[i]t is the peculiar province of the legislature to prescribe general rules for the government of society; the application of those rules to individuals in society would seem to be the duty of other departments." *Fletcher v. Peck,* 10 U.S. (6 Cranch) 87, 136, 3 L.Ed. 162 (1810). The Federalist Papers

acknowledged this same distinction, noting that when state legislatures had applied general laws to individual cases, they had violated the separation of powers by usurping power "belonging to the judicial department." The FEDERALIST No. 48 (James Madison).

¶ 40 The framers of our constitutional system of separated powers identified an important purpose for these limitations on the legislative power. They did so by highlighting a historical problem that gave rise to our constitutional framework:

> One abuse that was prevalent during the Confederation was the exercise of judicial power by the state legislatures. The Framers were well acquainted with the danger of subjecting the *determination of the rights of one person* to the 'tyranny of shifting majorities.' ... It was to prevent the recurrence of such abuses that the Framers vested the executive, legislative, and judicial powers in separate branches.

*INS v. Chadha,* 462 U.S. 919, 961–62 [103 S.Ct. 2764, 77 L.Ed.2d 317] (1983) (Powell, J., concurring) (emphasis added).

¶ 41 Thus, the constitutional limits on the legislative power are significant. By granting the legislature the power only to make laws that apply broadly, our constitutional tradition seeks to prevent unfair applications of the law to specific individuals. When the legislative power is properly used by weighing broad policy concerns to create a general "rule of conduct [that] applies to more than a few people," the concern of a tyrannical ma-

on other grounds by Neuberger v. City of Portland, 288 Or. 585, 607 P.2d 722, 725 (1980).

25. *See* Thomas M. Cooley, A Treatise on the Constitutional Limitations Which Rest upon the Legislative Power of the States of the American Union 109–10 (The Lawbook Exchange, Ltd., 5th prtg., 1998) (Boston; Little, Brown, & Co., 5th ed., 1883) (defining legislative power as the power to make general rules for the government of society, which are "predetermination[s] of what the law shall be for the regulation of all future cases falling under [their] provisions").

26. *See, e.g., Bowsher v. Synar,* 478 U.S. 714, 733, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986) ("Interpreting a law enacted by Congress to implement the legislative mandate is the very essence of 'execution' of the law.").

27. *See also Snow v. Office of Legislative Research and Gen. Counsel,* 2007 UT 63, ¶ 12, 167 P.3d 1051 ("The legislative branch of government is charged with the declaration of policy, in response to the expressed wishes of citizens shown by the selection of their representatives and senators. The executive branch is charged with implementation of that policy."); *Tribune Reporter Printing Co. v. Homer,* 51 Utah 153, 169 P. 170, 172 (1917) ("[I]t must be remembered that matters of public policy are clearly within the province of the Legislature. The Legislature has power to determine what [state policy] shall be, and in the exercise of this power it is limited only by the state and federal Constitutions.").

jority singling out one individual is greatly reduced. *See Bi–Metallic Inv. Co. v. State Bd. of Equalization*, 239 U.S. 441, 445, 36 S.Ct. 141, 60 L.Ed. 372 (1915).[28]

¶ 42 The same policy is advanced by parallel constitutional provisions reflecting similar limitations on the legislative power. The Bill of Attainder Clauses of our state and federal constitutions,[29] for example, proscribe acts by the legislature that "impose[ ] guilt, and inflict[ ] punishment, upon an identifiable individual or group without judicial process." *Redwood Gym v. Salt Lake Cnty. Comm'n*, 624 P.2d 1138, 1147 (Utah 1981).[30] This proscription prevents the legislature from impinging on the domain of the judiciary. "[T]he Bill of Attainder Clause was intended not as a narrow, technical ... prohibition, but rather as an implementation of the separation of powers, a general safeguard against legislative exercise of the judicial function, or more simply—trial by legislature." *United States v. Brown*, 381 U.S. 437, 442, 85 S.Ct. 1707, 14 L.Ed.2d 484 (1965).

■ ¶ 43 Like the Bill of Attainder Clause, the prohibition on "private or special" laws in article VI, section 26 of the Utah Constitution can be seen as policing the separation of powers.[31] Our longstanding definitions of general and special laws closely track the distinction between the legislative power and the judicial and executive powers. General laws "apply to and operate uniformly upon all members of any class of persons, places, or things requiring legislation peculiar to themselves in the matters covered by the laws in question." *State v. Kallas*, 97 Utah 492, 94 P.2d 414, 420 (1939) (internal quotation marks omitted). Special laws ap-

ply "either to particular persons, places, or things, or to persons, places, or things which, though not particularized, are separated by any method of selection from the whole class to which the law might, but for such legislation, be applied." *Id.* (internal quotation marks omitted). Moreover, the traditional justifications for prohibiting special laws relate to the nature and limits of legislative power:

> [E]very one has a right to demand that he be governed by general rules, and a special statute which, without his consent, singles his case out as one to be regulated by a different law from that which is applied in all similar cases, would not be legitimate legislation, but would be such an arbitrary mandate as is not within the province of free governments.[32]

Thus, the special-laws prohibition is more than a guarantee that laws will be applied equally. It is a reflection of the nature of legislative power, which confirms that such power typically is limited to making laws of general applicability based on policy preferences.

2

¶ 44 The nature of the legislative power can be further elaborated by examining historical invocations of this power and of its executive and judicial counterparts. In the criminal realm, legislation has long prescribed generally applicable standards of conduct based on broad policy considerations regarding the social implications of such conduct. Once the generally applicable rule is adopted in the legislature, however, the law's enforcement and application to individuals

---

28. *Bi–Metallic* is often cited as the judicial wellspring of the legislative/administrative distinction. *See, e.g.*, Freilich & Guemmer, *supra* note 12, at 529 ("The origin of the legislative/adjudicative distinction can be traced to the Supreme Court's decision in *Bi–Metallic Investment Co. v. State Bd. of Equalization*, wherein the Court distinguished the procedural requirements associated with adjudicative and legislative municipal acts." (footnote omitted)); *see also Pro–Eco, Inc. v. Bd. of Comm'rs*, 57 F.3d 505, 513 (7th Cir. 1995) (citing *Bi–Metallic* ) ("Governing bodies may enact generally applicable laws, that is, they may legislate, without affording affected parties so much as notice and an opportunity to be heard.").

29. U.S. Const. art. I, § 9, cl. 3; *id.* art. I, § 10, cl. 1; Utah Const art. I, § 18.

30. *See also* Black's Law Dictionary 188 (9th ed. 2009) (defining "bill of attainder" as a "special legislative act prescribing punishment, without a trial, for a specific person or group").

31. "No private or special law shall be enacted where a general law can be applicable." Utah Const. art. VI, § 26.

32. Cooley, *supra* note 25, at 484.

depend on the acts of the other two branches.

¶ 45 In the criminal realm, the legislature makes threshold policy decisions on matters such as drug enforcement. It decides, for example, whether to designate a particular substance as illegal and how to punish its manufacture or sale. The product of those decisions is a statute that applies to all who fall under its general terms. That is not to say that a statute must always extend to more than one person to qualify as legislation. If the legislature identifies a new synthetic substance with properties identical to an already-illegal drug, for example, the criminalization of that new substance conceivably could apply to only one manufacturer (if, for example, there is only one source of the substance when the law is enacted).[33] So long as the law is formulated in a way that would encompass all who come within its terms, it is an appropriate legislative act.

¶ 46 Legislative policy decisions in the criminal realm are distinguishable, however, from the individualized decisions made by the executive and judicial branches in enforcing and applying the criminal law. Criminal prosecution is the quintessential executive act.[34] It involves the application of general rules to individual citizens through legal proceedings in which the executive seeks to demonstrate that the circumstances of the individual fit the terms of the general rule and merit the imposition of the sanction it calls for.

¶ 47 Once a particular substance is criminalized by statute, it is the executive that applies the law to those who make or deal it. Executive acts typically are based not on broad policy grounds, but on individualized,

case-specific considerations as to whether the acts of a particular person fall within the general rule adopted by the legislature. Thus, the executive encompasses not just prosecutorial decisions involving proposed sanctions, but parallel acts like permitting or licensing in circumstances where the law opts for that form of regulation.[35] Such decisions, again, involve case-specific evaluation of specific individuals (for example, whether they meet the permitting or licensing standards prescribed by the legislature), not the policy-based promulgation of the rules to be applied.

¶ 48 The legislative and executive domains are also evident in decisions regarding certain positions or offices of government. General rules establishing the responsibilities, jurisdiction, and compensation for such offices may initially be established by the legislature. (Those rules are properly legislative, moreover, even though the terms prescribed for a single office may initially extend to the one and only officer to serve therein, since the law as written is still "general" in its application to the office and not particularized to a certain individual.) But after those terms are established, it is the executive that generally implements them, through the prototypical executive function of appointment.

¶ 49 Under the Utah Constitution, the governor appoints "all State and district officers whose offices are established by [the] Constitution, or which may be created by law, and whose appointment or election is not otherwise provided for." UTAH CONST. art. VII, § 10(1)(a). While the legislature may create government offices and specify the general duties and privileges of each office, the appointment power authorizes the governor to

33. *See, e.g.,* H.B. 23, 59th Leg., Gen. Sess. (Utah 2011) (criminalizing possessing, manufacturing, and dealing synthetic cannabinoid products commonly known as "spice," which initially was sold in Utah by only a small number of retail stores).

34. *See Heckler v. Chaney,* 470 U.S. 821, 832, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985) (noting that the decision whether to prosecute a specific case "has long been regarded as the special province of the Executive Branch, inasmuch as it is the Executive who is charged by the Constitution to 'take Care that the Laws be faithfully executed' "); *see also United States v. Nixon,* 418 U.S. 683, 693, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974)

(noting that "the Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case"); *cf.* UTAH CONST art. VII, § 5(1) ("The executive power of the state shall be vested in the Governor who shall see that the laws are faithfully executed.").

35. *See, e.g.,* Utah Division of Occupational and Professional Licensing Act, UTAH CODE § 58–1–103 (creating "within the Department of Commerce the Division of Occupational and Professional Licensing," which "shall administer and enforce all licensing laws within Title 58").

place specific, identified individuals into those offices. In this way, the legislature creates general offices, and the governor fills the office, considering the facts and circumstances of specific individuals.

¶ 50 Finally, the legislature and the executive are ultimately dependent on the judicial branch to resolve disputes regarding the application of legislative acts to the circumstances of individual cases. The work of the judiciary is to determine an individual's rights or obligations in relation "to what the existing law is," based on the specific facts and circumstances of the case.[36] Thus, the judicial power is contrasted with the legislative in that the latter formulates general rules and the former is charged with interpreting them and applying them to individual cases. Judicial decisions, in other words, are generally focused on interpreting the policy decisions of the legislature—not on making those decisions in the first place—and applying them to the facts of an individual case as found by the court.[37]

### C

■ ¶ 51 In light of the foregoing, a ballot initiative should be deemed an appropriate legislative act where it proposes a law of general applicability. Laws that prescribe rules of conduct for the general population are squarely within the ambit of generally applicable rules, and ballot initiatives proposing such laws are per se legislative.

■ ¶ 52 General application to the population as a whole is a sufficient condition to sustain the legislative propriety of a ballot initiative. But it is not a necessary condition. Legislation usually applies to "more than a few people," [38] but there are circumstances where legislation may properly extend to only one or a few individuals. Such a law could still be "legislative" where it (1) is based on general policy concerns rather than individual circumstances and (2) governs "all future cases falling under its provisions" [39] and not just specified individuals.

■ ¶ 53 In questionable cases at the margins of these standards, it may be useful to consult historical examples of traditional exercises of legislative power. Thus, if a particular initiative seems close to a blurry part of the doctrinal line between the legislative and the executive, a court's decision may be informed by history. An initiative that finds longstanding parallels in statutes enacted by legislative bodies, for example, may be deemed legislative on that basis, while initiatives that seem more like traditional executive acts may be deemed to fall on that side of the line.[40]

### D

¶ 54 Our decision today adopts a new paradigm for evaluating the propriety of ballot initiatives under our constitution. In so doing, however, we do not intend to signal an

---

**36.** Cooley, *supra* note 25, at 109–10 (contrasting legislative and judicial power).

**37.** *See, e.g., Jones v. Barlow*, 2007 UT 20, ¶¶ 34–36, 154 P.3d 808 (explaining that the legislature's role is to make policy judgments and create law for resolving future cases, and the judiciary's role is to apply that law to specific cases).

**38.** *See Bi–Metallic Inv. Co. v. State Bd. of Equalization*, 239 U.S. 441, 445, 36 S.Ct. 141, 60 L.Ed. 372 (1915); *see also Allison v. Wash. Cnty.*, 24 Or.App. 571, 548 P.2d 188, 190–91 (1976) ("Action is legislative [in the zoning context] when it affects a large area consisting of many parcels of property in disparate ownership. An example would be a zoning ordinance, that happened to be adopted by initiative, restricting buildings to a height of 30 feet in all of San Diego, California between Inter state 5 and the ocean. Conversely, action is considered quasijudicial when it applies a general rule to a specific interest, such as a zoning change affecting a single piece of

property, a variance, or a conditional use permit." (footnotes omitted)).

**39.** Cooley, *supra* note 25, at 109–10 (defining legislative power).

**40.** *See Printz v. United States*, 521 U.S. 898, 905, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997) ("[E]arly congressional enactments provid[e] contemporaneous and weighty evidence of the Constitution's meaning." (second alteration in original) (internal quotation marks omitted)); *Myers v. United States*, 272 U.S. 52, 175, 47 S.Ct. 21, 71 L.Ed. 160 (1926) ("This court has repeatedly laid down the principle that a contemporaneous legislative exposition of the Constitution, when the founders of our government and framers of our Constitution were actively participating in public affairs, acquiesced in for a long term of years, fixes the construction to be given its provisions.").

abrupt change in the scope of the initiative power or in the results that we foresee in the cases that come before us. In fact, the framework articulated above preserves the results of many of our prior cases in this field and is even consistent with some of our prior analysis.

¶ 55 To minimize confusion going forward, we seek here to put the framework we adopt today in the context of our prior decisions in this area. In the sections that follow, we highlight elements of our prior standards that we preserve, identify other elements that we disavow, and explain in broad strokes the implications of our new framework for the results of our prior cases.

1

¶ 56 Our precedents in this field have offered threshold statements regarding the nature of the legislative initiative power that are consistent with and complement the framework we adopt today. In *Keigley v. Bench* (*Keigley II*), 97 Utah 69, 89 P.2d 480 (1939), for example, this court articulated a standard that correctly linked the people's article VI power with the constitutional principle of separation of powers. Specifically, *Keigley II* acknowledged that article VI vests "legislative power—and such power only— directly in the people," and emphasized that such power does not extend to executive or judicial acts. *Id.* at 483. We reaffirm and expand on that principle in our decision today, which rests on the *Keigley II* premise that the people's legislative power is parallel to that possessed by the legislature.

¶ 57 Our cases have also offered a useful starting premise for evaluating the

nature of the legislative power that is consistent with our decision today. As noted in *Keigley II*, the legislative power gives rise to "new law," while executive power implements a law "already in existence." *Id.* at 484 (internal quotation marks omitted).[41] This premise is correct (if a bit abstract); it gets at the general distinction between legislative and executive acts. We accordingly endorse and preserve it, as elaborated and applied above.

¶ 58 Finally, our cases have previously stated that laws of a " 'permanent or general character are considered to be legislative, while those which are temporary in operation and effect are not,' " *Id.* (quoting *Monahan v. Funk*, 137 Or. 580, 3 P.2d 778, 779 (1931)). This principle is consistent with the framework embraced today to the extent "permanent" laws are policy-based rules of broad applicability. Courts in other jurisdictions have suggested that a government act may be "temporary" in operation in the sense that it is based on individual facts and circumstances and applies only to specific individuals.[42] In that sense our precedent is preserved in its reference to the distinction between laws of "permanent" and "temporary" character, although that terminology may be confusing and perhaps should give way to the standards we embrace explicitly above.

2

¶ 59 Other elements of our jurisprudence in this field are incompatible with the nature of the legislative initiative power as outlined above. Such elements are accordingly disavowed.

---

41. *See also Friends of Maple Mountain, Inc. v. Mapleton City*, 2010 UT 11, 119, 228 P.3d 1238; *Wilson v. Manning*, 657 P.2d 251, 254 (Utah 1982).

42. *See In re Opinion of the Justices*, 66 N.H. 629, 33 A. 1076, 1078 (1891) ("'[A] [l]aw is a rule, not a transient, sudden order from a superior to or concerning a particular person; but something permanent, uniform, and universal." (internal quotation marks omitted)).
    *Keigley v. Bench* (*Keigley II*), stated that "actions which relate to subjects of a permanent or general character are considered to be legislative." 97 Utah 69, 89 P.2d 480, 484 (1939) (internal quotation marks omitted). This word-

ing may have erroneously implied that the underlying subject matter relating to an initiative—as opposed to the law created by the initiative— must be permanent. For example, the court in *Shriver v. Bench* apparently believed that because the policy issues relating to firefighter's salaries could change over time, the voter initiative to permanently set salaries in that case failed the permanency test. 6 Utah 2d 329, 313 P.2d 475, 478 (1957). This is not what we mean by permanent. Instead, permanency refers to the law passed by the initiative. And a permanent law applies to all future cases until repealed or altered by further legislative action.

¶ 60 First, we repudiate the "three-part balancing test" for distinguishing legislative and executive acts articulated in *Citizen's Awareness Now v. Marakis*, 873 P.2d 1117, 1123 (Utah 1994), and *Friends of Maple Mountain, Inc. v. Mapleton City*, 2010 UT 11, ¶ 32, 228 P.3d 1238. Contrary to our opinion in *Marakis*, the judicial evaluation of the propriety of an initiative is not a matter of balancing "policy elements" or of engaging in a "policy-based line of reasoning." *Id.* The *Marakis* factors, moreover, are largely inconsistent with the text of the Utah Constitution as we now interpret it. An initiative's consistency with the "general purpose and policy" of existing law, *id.* at 1124, for example, does not tell us whether it is properly legislative. Nor is it relevant whether it proposes a "material variance" in the law, *id.* at 1123. The legislature often approves bills that make only minor changes to existing law that are entirely consistent with its current purpose, and no one challenges such bills as beyond the legislature's constitutional capacity.[43] Because the people have the same power as the legislature, an initiative can likewise adopt only incremental changes, or implement changes consistent with the general purpose of existing law.

¶ 61 We also disavow the inquiry into whether a particular matter is practically "appropriate" for determination by voters.[44] The constitution leaves no room for the courts to question whether voter initiatives address issues "of such complexity that it is not practical for the public to give [them] sufficient time and attention to make a proper determination of the matter." *Id.* at 1125 (internal quotation marks omitted).[45] As judges, our role is to interpret the meaning of the legislative power afforded to the people under the text of article VI. We have no business questioning the wisdom or efficiency of the exercise of the people's constitutional authority, least of all on the ground that the people may not be sophisticated enough to use their power intelligently or efficiently.

¶ 62 Efficiency is hardly the hallmark of our constitutional system of government. The framers built our government as "a bulwark against tyranny," not a model of efficiency.[46] If the people's initiative power is defined by reference to the separated branches of our inefficient government, we cannot properly "balance" that power away on the basis of its inefficiency.

¶ 63 Indeed, the inefficiency of direct democracy is an argument that was raised and rejected in the Progressive movement that gave rise to the initiative provisions of the Utah Constitution.[47] At the turn of the twentieth century, opponents of initiative amendments asserted that the people were incapable of wise and efficient government through direct democracy,[48] asserting that "the peo-

43. *See, e.g.*, H.B. 61, 2008 Leg., Gen. Sess., Designation of State Highways Amendments (Utah) (making minor changes to the state highway system); H.B. 235, 2008 Leg., Gen. Sess., County Merit System Amendments (Utah) ("clarifies" the County Personnel Management Act).

44. *Citizen's Awareness Now v. Marakis*, 873 P.2d 1117, 1125 (Utah 1994) ("Under this element, even if the zoning change was not within the general purpose and policy of the original ordinance and even if it amounts to a material variance, the change should nevertheless be ruled administrative if voter participation is inappropriate.").

45. *See also Shriver*, 313 P.2d at 478 (explaining that if a voter initiative would "impair the efficient administration of the municipality, the courts tend toward the conclusion that initiative and referendum provisions are not applicable," and holding that prohibiting the people from directly determining public employees' salaries was justified by "the practical exigencies of the operation of city government"); *Mouty v. Sandy City Recorder*, 2005 UT 41, ¶ 32, 122 P.3d 521 ("[W]e have been hesitant to hold that an unqualified referendum right extends to municipal considerations involving necessarily complex issues, as the resolution of such matters may be best left to the mechanisms generally employed by municipal governments.").

46. *See, e.g.*, *United States v. Brown*, 381 U.S. 437, 443, 85 S.Ct. 1707, 14 L.Ed.2d 484 (1965) ("Th[e] 'separation of powers' was obviously not instituted with the idea that it would promote governmental efficiency. It was, on the contrary, looked to as a bulwark against tyranny.").

47. *See* Karl Manheim & Edward P. Howard, *A Structural Theory of the Initiative Power in California*, 31 Loy. L.A. L. Rev. 1165, 1170 (1998) ("Indeed, the current debate about the initiative power mirrors the larger debate, over two centuries old, about the wisdom of democracy itself.").

48. *See, e.g.*, Massachusetts Debates, *supra* note 15, at 12 (minority report of the Committee on Ini-

ple are not informed or caring enough to vote on complicated public policy issues."[49] Supporters responded with the notion that any weaknesses with direct democracy were outweighed by the need for the people to cure the "evils that ha[d] grown up" under an "unrestricted representative form of government."[50] The proponents of direct democracy won this political debate in many states, including Utah, where the people amended their constitutions, reserving power to themselves to initiate legislation. Thus, the capacity of the people to devote sufficient time and attention to complex issues is a political question that has long since been answered by the body with inherent authority to govern—the people. It is our role to enforce that decision, not to second-guess it.

¶ 64 We accordingly repudiate the *Marakis* framework embraced in our recent decisions in this field. The power of the people to legislate by initiative does not depend on the degree to which the people may wish to depart from existing law or on the proposed initiative's consistency with the general policy of existing law. Nor does it turn on a judicial assessment of the people's capacity to comprehend or efficiently legislate on a particular matter. All these concerns are matters that may be raised in an initiative campaign for voter consideration at the ballot box. They are not grounds for the judicial rejection of an initiative under the constitution, however, and we accordingly disavow them.

3

¶ 65 A paradigm shift of the sort we adopt today will naturally lead to questions about the viability of our prior decisions in this area. We cannot resolve all such questions here. For the sake of transparency and clarity, however, we offer some guidance on the general impact of today's decision on the results of some of our cases in this area.

¶ 66 Our cases outside the zoning field include *Low v. City of Monticello,* 2002 UT 90, 54 P.3d 1153; *Keigley v. Bench (Keigley I),* 90 Utah 569, 63 P.2d 262 (1936); *Keigley v. Bench (Keigley II),* 97 Utah 69, 89 P.2d 480 (1939); and *Shriver v. Bench,* 6 Utah 2d 329, 313 P.2d 475 (1957). We reaffirm the results of all these cases except *Shriver.*

¶ 67 In *Low,* we held that a city council's decision to exercise an option to repurchase an electrical power distribution system was administrative and not subject to referendum. 2002 UT 90, ¶ 27, 54 P.3d 1153. This was because exercising the option was more like making a "contract with the seller" than making a "policy-based legislative decision" to create the option in the first place. *Id.* That holding is consistent with the framework we adopt today and is accordingly reaffirmed. Government decisions to enter into a contract with a specific entity or to exercise a specific option to purchase a power plant are not legislative. They do not involve the adoption of generally applicable rules in the implementation of public policy. They are instead executive acts involving specific individual parties and accordingly are outside the bounds of the legislative power.

¶ 68 The two *Keigley* decisions are likewise consistent with our new framework. In these two cases, we held that an ordinance authorizing the issuance of municipal bonds was legislative and subject to referendum because the bonds were "a matter of public policy of vital importance to the inhabitants of the city." *Keigley I,* 63 P.2d at 265; *see also Keigley II,* 89 P.2d at 484. That result is correct under the standards set forth in this opinion, as the authorization of a bond is a generally applicable, policy-based decision. Such decisions, moreover, have long been the province of legislative bodies, which approve bonds just as they approve new taxes.[51] Thus, the *Keigley* cases, like *Low,* would come out the same way under our new

---

tiative and Referendum) ("[T]he western experience is that practically no voters read and understand the text of complicated laws proposed, and only a small percentage read the arguments fully and attentively.").

49. Cronin, *supra* note 11, at 51.

50. Massachusetts Debates, *supra* note 15, at 20 (statement of Joseph Walker).

51. *See* Utah Code §§ 63B–2–101 to 63B–20–201 (legislative authorization for bond issuances for the years 1993–2011).

framework, and they are accordingly reaffirmed.

¶ 69 The same cannot be said of our decision in *Shriver*, however. *Shriver* held that setting "salaries for policemen and firemen [was not] a proper subject of initiative," in part because the public purportedly lacked the capacity to effectively comprehend and regulate such matters. 313 P.2d at 476–78. We disagree with and hereby overrule *Shriver*. The people's supposed incapacity to understand and address the proper compensation of public officials is not a proper ground for withholding that power for reasons noted above. And as explained in greater detail below, *infra* ¶¶ 74–78, the fixing of public salaries is a quintessential legislative act, in that it involves the adoption of a generally applicable rule and is a function long adopted by the legislature.

¶ 70 The bulk of our other cases in this field involve the zoning of real property. We summarize our recent decisions in this area and reaffirm all but two of them as consistent with our new framework.

¶ 71 Consistent with the general-applicability rule we have adopted today, we have said that enacting a broad zoning ordinance is a legislative act and that application of a zoning ordinance to individual property owners, such as by "variances" and "conditional use" permits, is an executive act. *Friends of Maple Mountain, Inc. v. Mapleton City*, 2010 UT 11, ¶ 15, 228 P.3d 1238. Some zoning decisions fall clearly on the legislative side of the line we draw today. In *Sevier Power Co. v. Board of Sevier County Commissioners*, 2008 UT 72, 196 P.3d 583, for example, voters in Sevier County proposed through ballot initiative to amend a county ordinance that governed conditional land uses. The initiative sought "to add an additional element to the criteria specified for approval of all conditional use permits." *Id.* ¶ 14. We held that the initiative was legislative because it "addresse[d] the overall conditional use permit issuance and revocation ordinance, modifying the framework to be applied to any and all coal-fired electricity generation power facilities seeking a conditional use permit in Sevier County." *Id.* ¶ 15. This holding fits squarely within the general-applicability

standard; the initiative sought to enact a generally applicable law that applied to all persons seeking conditional use permits, not merely one individual applicant.

¶ 72 Other zoning decisions are more difficult to classify, as they involve acts in the gray area between the clearly legislative and the clearly executive. Site-specific zoning ordinances present the classic hard case. On one hand such decisions have an executive aspect to them in that they affect only one piece of property and, like variances, do not result in the announcement of a rule that applies generally to other pieces of property. At the same time, however, zoning ordinances typically run with the land and apply equally to the property's present owner and all future owners. Zoning ordinances therefore establish generally applicable rules in the same sense as any other rule that applies to all present and future parties that meet its terms. Such decisions, moreover, often involve the kind of decisionmaking that is "the essence of legislating"—a "balancing of policy and public interest factors." *Friends of Maple Mountain*, 2010 UT 11, ¶ 15, 228 P.3d 1238.

¶ 73 Two of our recent precedents in site-specific zoning cases resolve this tension through formal rules, one that turns on the nature of the government body rendering the zoning decision, and another based on an understanding that certain decisions are based on broad, legislative policy considerations. In *Mouty v. Sandy City Recorder*, 2005 UT 41, 122 P.3d 521, we found a site-specific zoning amendment legislative because it was adopted by a city council (in a council-mayor form of government) possessing only legislative power. *Id.* ¶ 28. In so ruling, we recognized the difficulty of classifying site-specific zoning decisions, but we held that a city council in a council-mayor form of government could be presumed to be exercising such power when it adopted a site-specific zoning amendment.

¶ 74 In our decision in *Friends of Maple Mountain*, we distinguished a city council's "adoption of a new zoning classification" from other government actions "within the framework of the existing zone," such as variances and conditional use decisions by an adjust-

ment board. 2010 UT 11, ¶¶ 15–17, 228 P.3d 1238. *Friends of Maple Mountain* deemed the former "per se legislative action" subject to referendum because the council, in adopting a new classification, is "balancing ... policy and public interest factors[,] which is the essence of legislating." *Id.* ¶ 15.

¶ 75 The bright-line rules adopted in *Mouty* and *Friends of Maple Mountain* are sensible ones, and we hereby reaffirm them. It will not always be easy to classify a site-specific zoning amendment as falling clearly on the legislative or executive side of the line between the two. In cases of doubt, however, our precedents give controlling significance to the form of the underlying governmental decision. Thus, under *Mouty,* a site-specific zoning decision is legislative (and thus referable) if it is made by a city council that possesses only legislative authority. And under *Friends of Maple Mountain,* a site-specific zoning decision is legislative if it involves the adoption of a new zoning classification. Such decisions are at least arguably legislative, and our cases deeming them so give understandable deference to the formal nature of the government body involved in making them and the formal nature of the zoning ordinance.[52]

### E

¶ 76 We turn, finally, to the initiatives at issue in this case. In our view, Initiatives One and Two fall comfortably within the constitutional framework set forth above. Initiative One sets salary limits on all city officials who are ineligible for overtime pay. If passed, this initiative would apply generally to any person fitting the definition of a city employee who is ineligible for overtime. All current and future employees coming within the initiative's terms would be subject to the initiative. Rather than applying to one specific person, the salary limits apply generally to the entire class of persons specified by the proposed law. The adoption of salary limits for city offices, moreover, is based on broad policy considerations pertinent to the offices, not the specific circumstances of individual, identified employees. This is classic legislation possessing all of the hallmarks of the legislative power.

¶ 77 Initiative Two is likewise legislative. It imposes a residency requirement for eighteen city officials. This requirement is generally applicable because, for each listed official, all present and future individuals obtaining that office would be subject to the residency requirement. Like the salary cap, the residency requirement applies generally to an entire class of persons, not a specific person. And again a decision whether to impose a residency requirement is based on broad policy considerations pertinent to the office, not the specific circumstances of individual officers. This, too, is classic legislative action within the people's initiative power.

¶ 78 If there were any doubt about the legislative nature of these initiatives, it could easily be resolved by reference to historical uses of similar government power. Here again, history confirms our theoretical analysis. Residency and salary restrictions are hardly novel exercises of legislative power. In fact, the legislature has long adopted residency requirements for various county and municipal government offices by legislation.[53]

---

52. Two of our other cases, *Wilson v. Manning,* 657 P.2d 251 (Utah 1982), and *Bird v. Sorenson,* 16 Utah 2d 1, 394 P.2d 808 (1964), are more difficult to analyze under the framework we adopt today, as they involved referenda on site-specific rezoning decisions that carried no formal indicia of legislative action. We need not—and do not—decide whether these decisions should survive under our new framework. We reserve that question for another day in which the issue is squarely presented and fully briefed. For now, we repudiate only the legal standard applied in *Wilson* and *Bird,* without deciding whether a site-specific rezoning decision like that at issue in those cases would be properly referable to the people.

53. *See, e.g.,* UTAH REV. STAT. § 540 (1898) ("No person is eligible to a county, district, or precinct office, who, at the time of his election, is not an elector of the county, district, or precinct in which the duties of the office are to be exercised."); *id.* § 221 ("No person shall be eligible to any office who is not a qualified elector of the city...."); UTAH CODE § 17–16–1(2)(a)–(b)("(2)(a) A county, district, precinct, or prosecution district officer shall maintain residency within the county, district, precinct, or prosecution district in which he was elected during his term of office. (b) If a county, district, precinct, or prosecution district officer establishes his principal place of residence as provided in Section 20A–2–105 outside the county, district, precinct, or prosecution

¶ 79 As for salaries for government offices, our state constitution tasks the legislature with setting many such salaries, including "[t]he Governor, Lieutenant Governor, State Auditor, State Treasurer, Attorney General, and any other state officer as the Legislature may provide." Utah Const. art. VII, § 18.[54] Following this constitutional mandate, the legislature has—since the founding of our state—enacted legislation setting the extent and limits of public-employee compensation.[55]

¶ 80 This historical pattern confirms that public-employee compensation and residency requirements are subject matters appropriate for legislative control. Initiatives One and Two are properly legislative and should have been accepted by the Lehi City recorder for placement on the municipal ballot.

## IV

¶ 81 Lehi City also challenges Initiative One as contrary to the procedural requirements of Utah Code section 10–3–818. That section requires that a municipal "governing body" hold a noticed public hearing prior to adopting any limits on city-employee salaries. Relying on *Dewey v. Doxey–Layton Realty Co.*, 3 Utah 2d 1, 277 P.2d 805 (1954), Lehi argues that voter initiatives must "constitute such legislation as the legislative body of the city has the power to enact under the law defining the powers of such body." *Id.* at 807. And under *Dewey*, "when the method for the exercise of [municipal] power is prescribed by ... statute[,] such method is the measure of the power to act." *Id.* at 808 (quoting *Hurst v. City of Burlingame*, 207 Cal. 134, 277 P. 308, 311 (1929)).

Thus, because Utah Code section 10–3–818 imposes notice and public hearing requirements for adopting limits on city-employee salaries, Lehi insists that the ballot-initiative process—which contemplates no such notice and hearing—is unlawful.

¶ 82 We disagree with Lehi and with *Dewey*. Initiative One does not exceed the scope of the people's initiative power. Nor is it in conflict with section 10–3–818.

¶ 83 To begin with, *Dewey*'s rationale cannot survive under the constitutional framework we have explained today. *Dewey* was based on an assertion that the people's initiative power is delegated to them by the legislature:

> [T]he legislature has delegated the power to zone to the legislative bodies of cities and towns.... Thus, when appellants seek to initiate rezoning within the city without complying with the zoning statute, they are, in effect, attacking collaterally the very statute under which they claim their power to zone.

*Id.* at 809. This is incorrect. The initiative power is not delegated power. *See supra* ¶ 30. The people do not claim their power to initiate legislation under any statute. Instead, the people have retained the legislative power under article VI of the constitution.

¶ 84 Also, *Dewey*'s requirement that ballot initiatives must "constitute such legislation as the legislative body of the city has the power to enact under the law defining the powers of such body," 227 P.2d at 807, is based on an incorrect understanding of the initiative power and its relationship to municipal govern-

district in which he was elected, the office is automatically vacant."); *id.* § 10–3–301(3)(a) ("Each elected officer of a municipality shall maintain residency within the boundaries of the municipality during the officer's term of office.").

54. Historically, the U.S. Congress was responsible for setting its own pay. *Humphrey v. Baker*, 848 F.2d 211, 212 (D.C.Cir.1988) ("From the founding of the Republic until 1967, Congressional pay was determined directly by Congress, in specific legislation setting specific rates of pay.").

55. *See, e.g.*, Utah Rev. Stat. § 2050 (1898) (fixing annual salaries of the fish and game warden ($500), clerk of the supreme court ($2100), coal

mine inspector ($1000), and bank examiner ($1200)); *id.* § 2057 (setting maximum salaries for county officials, including commissioners, sheriffs, clerks, treasurers, surveyors, and auditors); Utah Code §§ 67–22–1, –2 (fixing the salary for the governor ($109,900), and for the state auditor and state treasurer ("95% of the governor's salary"); and making detailed specifications regarding the governor's benefits, including the availability of a "vehicle for official and personal use," dental insurance, health insurance, housing, and household expenses); *see also* 1990 Utah Laws 1452 (setting salary ranges for five constitutional offices and twenty-five other state offices).

ments. The source and nature of the people's power to initiate legislation at the local level differs from the power that is wielded by local governmental entities, such as city councils. The people's initiative power is parallel to the state legislature's power. A city council's governmental power is not parallel to or coextensive with the state legislature's power, but is in some respects more limited than the people's initiative power, and in others more expansive.

¶ 85 The authority of a city council is broader than the local initiative power in that city councils often wield both legislative and executive power.[56] The retained initiative power of the people, by contrast, is purely legislative.

¶ 86 But local government entities often act through mere delegated legislative authority, and in that sense the power of a city council is narrower than the power retained by the people.[57] The people are not so limited in their exercise of the initiative power: Such power is organic, not delegated, and it is accordingly less subject to statutory restriction by the legislature.

¶ 87 The consequence of this power structure is that the legislature's statutory delegation of power to municipal governments is independent of the people's constitutional initiative power. Thus, there is no basis for requiring ballot initiatives to "constitute such legislation as the legislative body of the city has the power to enact." *Id.* The only laws regulating the people's initiative power—whether at a statewide or local level—are the "manner and conditions" provisions authorized under article VI section 1(2). *See* Utah Code §§ 20A–7–101 to –801.

¶ 88 If we required ballot initiatives to conform to procedural restrictions on local governments, we would mandate absurd results that would read the initiative power out of the constitution. City councils and other legislative bodies are subject to numerous procedural restrictions that cannot possibly extend to ballot initiatives. It would make no sense to require ballot initiatives to follow Utah Code section 10–3–506, for example, which requires the city council to take a "roll call vote" prior to passing certain city ordinances, or to follow the constitutional or statutory procedures for enacting legislation. The procedures applicable to ballot initiatives are simply distinct from those applicable to the legislature or municipal governments. Because the procedural requirements for ballot initiatives are solely contained in "manner and conditions" statutes authorized under article VI, section 1(2), we overrule *Dewey* to the extent that it suggests otherwise.

¶ 89 In any event, Utah Code section 10–3–818 is not aimed at regulating the initiative process anyway. Section 10–3–818 simply sets out the procedural requirements that the "governing body" of a municipality must follow when amending or adopting city-employee "compensation schedules." *Id.* §§ 10–3–818(1) to (4). It requires the "governing body" to "set a time and place for a public hearing at which all interested persons shall be given an opportunity to be heard." *Id.* But by its own terms, the "governing body" subject to these requirements is defined as a city commission, city council, or town council, depending on the classification of the municipality. *Id.* § 10–1–104(3). Nothing in this statute refers to the voters, the people, or

---

**56.** *See* Utah Code § 10–3b–101 to –507 (providing for various forms of municipal government, some of which vest undifferentiated governmental powers in the city council).

**57.** The governmental powers of a municipality depend on whether the municipality is a "charter" or noncharter city. *See* Utah Const. art. XI, § 5. Charter cities operate under a direct grant of constitutional power under article XI, while noncharter cities exercise power delegated to them by the legislature solely as authorized by statute. *Id.; see also Provo City v. Ivie*, 2004 UT 30, ¶ 11, 94 P.3d 206 ("'Except for cities which operate under charter and derive their authority from Article XI, Section 5 of the Utah Constitu-

tion, the cities of this State are creatures of statute and limited in powers to those delegated by the legislature.... All power and authority of our nonchartered municipalities is derived through legislative grant....'" (alterations in original) (quoting *Call v. City of W. Jordan*, 606 P.2d 217, 223 (Utah 1979) (Wilkins, J., dissenting))); *State v. Hutchinson*, 624 P.2d 1116, 1121 (Utah 1980) ("Local governments, as subdivisions of the State, exercise those powers granted to them by the State Legislature, and the exercise of a delegated power is subject to the limitations imposed by state statutes...." (citation omitted)).

the public. Thus, section 10–3–818 contrasts starkly with the typical statute providing procedural requirements for ballot initiatives, which speaks of "adoption by the public," "legal voter[s]," and initiative "sponsors." *Id.* §§ 20A–7–101(6), (9), (20).

¶ 90 A statute that speaks only to the city council cannot be read to impose terms and conditions on voter initiatives. Such extension would introduce a series of unanswered policy problems, such as who would run the public hearing and where it would be held. We doubt the legislature would leave such crucial questions unresolved, and that doubt is a further reason to interpret section 10–3–818 to impose its procedural restrictions on the city council and not on the people.

## V

¶ 91 Finally, Lehi City challenges Initiatives One and Two on substantive constitutional and state law grounds. We conclude that these arguments are not ripe for review at this time and thus decline to reach them.[58]

¶ 92 Lehi first argues that Initiatives One and Two would violate article I, section 18 of the Utah Constitution and Article I, Section 10 of the United States Constitution, both of which prohibit laws "impairing the obligation of contracts." Second, Lehi asserts vague due process claims, including the notions that the public hearings provided for under Utah Code section 10–3–818(2) have "obvious constitutional underpinnings related to the Due Process Clause," and that terminating "an agreed to term of employment" based on residency requirements "without an individualized hearing implicates due process." And third, Lehi argues that Initiative Two will interfere with the mayor's removal power under Utah Code section 10–3b–104(1)(c), which authorizes the mayor, with the city council's "advice and consent," to appoint individuals for municipal office. According to the City, Initiative Two's residency requirement will result in "stripping the Mayor of his right and responsibility to remove the officials that he has appointed."

¶ 93 These substantive arguments—advanced not only prior to enforcement of the proposed initiatives, but prior to their enactment—are not ripe for review.

In order to constitute a justiciable controversy, a conflict over the application of a legal provision must have sharpened into an actual or imminent clash of legal rights and obligations between the parties thereto. Where there exists no more than a difference of opinion regarding the hypothetical application of a piece of legislation to a situation in which the parties might, at some future time, find themselves, the question is unripe for adjudication.

*Redwood Gym v. Salt Lake Cnty. Comm'n,* 624 P.2d 1138, 1148 (Utah 1981). Our ripeness doctrine serves several important functions. It first blocks the court from rendering advisory opinions on matters that may not impact the parties to a case. *Fundamentalist Church of Jesus Christ of Latter-Day Saints v. Lindberg,* 2010 UT 51, ¶ 40, 238 P.3d 1054. Second, by requiring a clear factual record prior to adjudication, the doctrine also facilitates informed decisions that fit the circumstances of individual cases.[59] And last, it prevents the court from intruding on legislative functions by unnecessarily rul-

---

**58.** We distinguish these substantive challenges from Lehi's other claims that the initiatives are not a proper subject matter for direct legislation and that the initiative process does not follow the proper procedures for enacting salary limits. Procedural and subject matter challenges are justiciable because they concern the *facial* question "whether the measure's proponents are legally entitled to invoke the direct legislation process in the first instance." James D. Gordon III & David B. Magelby, *Pre–Election Judicial Review of Initiatives and Referendums,* 64 Notre Dame L. Rev. 298, 298 (1989).

**59.** *Boyle v. Nat'l Union Fire Ins. Co.,* 866 P.2d 595, 598 (Utah Ct.App.1993) (noting that the ripeness doctrine prevents courts from "speculat[ing] as to what the facts may be" and from applying "hypothetical facts"); *Int'l Longshoremen's & Warehousemen's Union, Local 37 v. Boyd,* 347 U.S. 222, 224, 74 S.Ct. 447, 98 L.Ed. 650 (1954) ("Determination of the scope and constitutionality of legislation in advance of its immediate adverse effect in the context of a concrete case involves too remote and abstract an inquiry for the proper exercise of the judicial function.").

ing on sensitive constitutional questions.[60]

¶ 94 Pre-enactment review of a ballot initiative presents a particularly stark ripeness problem. Not only is the initiative not yet enforced, it is not yet enacted. Until proposed legislation becomes law, we could only review a hypothetical law and issue an advisory opinion. Since many ballot initiatives are never successfully enacted, constitutional review is in most cases unnecessary.[61] Then, even if the initiative passes, there is always a possibility that the law could be applied constitutionally, once again making our review unnecessary.[62] This double barrier compels us to apply the ripeness doctrine here.

¶ 95 This case presents a prototypical example of the problems associated with pre-enactment review of legislation. The case comes to us as a court of first review, without any discovery or factual development below. We have no way of knowing whether Initiatives One and Two will be enacted. And even if both Initiatives are successful, we cannot say which particular individuals will be affected by the salary restrictions and residency requirements, nor can we say how these ordinances might be implemented. We therefore decline to reach the substantive issues raised by the City.

## VI

¶ 96 For the foregoing reasons, we hold that Initiatives One and Two are proper exercises of the people's initiative power and affirm the petitioners' right to place them on the municipal ballot.

Justice LEE authored the opinion of the Court, in which Chief Justice DURHAM, Associate Chief Justice DURRANT, Justice PARRISH, and Justice NEHRING joined.

---

**60.** See Connecticut v. Duncan, 612 F.3d 107, 113 n. 3 (2d Cir.2010) ("The ripeness principles ... bear heightened importance when, as in the present case, the potentially unripe question presented for review is a constitutional question." (internal quotation marks omitted)); Simmonds v. INS, 326 F.3d 351, 357 (2d Cir.2003) (noting that the ripeness doctrine "enhance[s] the accuracy of [judicial] decisions," and enables courts to "avoid becoming embroiled in adjudications that may later turn out to be unnecessary or may require premature examination of, especially, constitutional issues that time may make easier or less controversial").

**61.** See Gordon & Magelby, supra note 59, at 311.

