*This opinion is subject to revision before final
publication in the Pacific Reporter*

**2018 UT 59**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

PAUL BAKER and STEPHEN D. STUART,
*Petitioners/Appellees and Cross-Appellants,*

*v.*

STEPHANIE CARLSON, HOLLADAY CITY RECORDER, and HOLLADAY CITY,
*Respondents/Appellants and Cross-Appellees,*
and
IVORY DEVELOPMENT, LLC,
*Intervening-Respondent/Appellant and Cross-Appellee.*

No. 20180717
Filed November 28, 2018

On Direct Appeal

Third District, Salt Lake
The Honorable Richard D. McKelvie
Case No. 180905777

Attorneys:

J. Craig Smith, Kathryn J. Steffey, Clayton H. Preece, Salt Lake City,
for petitioners/appellees and cross-appellants

Troy L. Booher, Beth E. Kennedy, Salt Lake City, Todd J. Godfrey,
Jayme L. Blakesley, Holladay, for respondents/appellants and
cross-appellees

Alan L. Sullivan, Wade R. Budge, Salt Lake City, for
intervening-respondent/appellant and cross-appellee

JUSTICE HIMONAS authored the opinion of the Court in which
CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE LEE,
JUSTICE PEARCE, and JUSTICE PETERSEN joined.

ASSOCIATE CHIEF JUSTICE LEE filed a concurring opinion.

JUSTICE HIMONAS, opinion of the Court:[1]

## INTRODUCTION

¶1     Since the old Cottonwood Mall closed its doors more than ten years ago, the City of Holladay has been looking for a way to redevelop the land on which the mall once stood. In May 2018, the City approved two resolutions, Resolution 2018-16 and Resolution 2018-17, that would enable Ivory Development, LLC to develop that land. In response, a group of citizens from Holladay petitioned to subject the Resolutions to a public vote by referendum. The district court held that Resolution 2018-16 was approved pursuant to the City's legislative power and is therefore referable. The district court also held that Resolution 2018-17 was approved pursuant to the City's administrative power and is therefore not referable. We affirm.

## BACKGROUND

¶2     In the mid-2000s, and after more than 40 years in business, the Cottonwood Mall shuttered its doors. Soon thereafter, the City began searching for a way to redevelop the land on which the Cottonwood Mall stood (the Site). In 2007, Cottonwood Mall, LLC, the owner of the Site, engaged the City in redevelopment talks and asked the City to rezone the Site to permit mixed uses. In response, the City approved the creation of a new zoning district, the Regional/Mixed-Use (R/M-U) zone, and rezoned the Site as R/M-U.

---

[1] We wish to acknowledge upfront the time-sensitive nature of this case and explain why we did not issue an order or opinion prior to the election. This court endeavors to resolve election matters in a way that provides clarity to those involved in the timeliest manner possible. In this case we suspended certain rules of appellate procedure and expedited the briefing and oral argument in an effort to reach a timely resolution. In these cases we also strive to quickly issue an order following oral argument outlining the outcome of the case with detailed opinions to follow. Unfortunately, there was not sufficient consensus among us regarding the correct outcome to issue such an order. And we determined that a perceived delay in issuing this decision was less objectionable than issuing a premature order that might not reflect the ultimate disposition of the case. We regret any uncertainty that this course of action has created and reaffirm our ongoing commitment to resolving these matters as quickly as possible.

¶3    In creating the R/M-U zone, the City also created the means by which development of an R/M-U zone is controlled. Specifically, any person wishing to build in an R/M-U zone must submit a site development master plan (SDMP) to the City for approval. The SDMP controls the development of all property within an R/M-U zone and is meant to serve as a guide for the overall development and design of the entire site—much in the same way the City's general plan functions in the context of the larger community. *See* HOLLADAY, UTAH, CODE §§ 13.65.030, .060. Once an SDMP has been approved, the City and the developer must enter into an Agreement for the Development of Land (ADL), which grants specific rights pursuant to the SDMP and addresses additional development-related issues. *See id.* § 13.65.070.

¶4    Pursuant to this framework, Cottonwood Mall, LLC submitted, and the City approved, an SDMP (the 2007 SDMP) and an ADL (the 2008 ADL) that contemplated redevelopment of the Site. Ultimately, Cottonwood Mall, LLC abandoned the project and nothing relevant to this case happened for nearly a decade.

¶5    In 2016, Cottonwood Mall, LLC and Ivory began negotiating the terms of a possible purchase of the Site and Cottonwood Mall, LLC's rights in the redevelopment project. In November 2017, Ivory submitted a proposal to the City to amend the 2007 SDMP. Two months later, after holding two public hearings and four work meetings to discuss the proposal, the City's Planning Commission voted 5-1 against recommending approval of the proposal to the City Council. As a result, Ivory revised its proposal and submitted a second proposal to amend the 2007 SDMP. The second proposal was considered by the City Council after a final public hearing and debate in May 2018. At the same time, the City also considered Ivory's proposal to amend the 2008 ADL. On May 17, 2018, the City Council passed Resolutions 2018-16 and 2018-17. Resolution 2018-16 approved Ivory's second proposal to amend the 2007 SDMP, as reflected in the 2018 SDMP. Resolution 2018-17 approved Ivory's proposal to amend the 2008 ADL, as reflected in the Amended ADL.

¶6    On May 22, 2018, Petitioners and several other sponsors (collectively, the Sponsors) filed an application with the City Recorder seeking to put the Resolutions to a public vote. The City provided the Sponsors with signature sheets as required by statute, but cautioned that providing the Sponsors with the signature sheets should not be interpreted to mean that the City considered the Resolutions to be referable. Nonetheless, the City scheduled a special election for November 6, 2018, in the event that the Resolutions were referable. Eventually, the Sponsors gathered and submitted enough

signatures to have the referenda placed on the ballot. Upon receiving the signed petitions, the City determined that the Resolutions were administrative in nature—and therefore not referable—and declined to place the referenda on the ballot.

¶7   In response, Petitioners initiated this action on August 13, 2018, by filing a petition for extraordinary writ in the district court seeking: (1) an order declaring the Resolutions to be legislative in nature and therefore referable, and (2) an extraordinary writ ordering the City to place the referenda regarding the Resolutions on the ballot. Soon after Petitioners filed suit, Ivory filed an unopposed motion to intervene, which the district court granted. Both Ivory and the City filed motions to dismiss Petitioners' claims.

¶8   At the request of the parties, and given the urgency of the matter, the district court agreed to hear the case on an accelerated schedule. The district court converted the motions to dismiss to motions for summary judgment[2] and, only ten days after Ivory and the City filed their motions to dismiss, the district court heard oral argument on the motions and issued its decision. In a thorough and thoughtful opinion, the district court held that Petitioners were entitled to summary judgment as to the claims related to Resolution 2018-16 (approval of the 2018 SDMP), while Ivory and the City were entitled to summary judgment as to the claims related to Resolution 2018-17 (approval of the Amended ADL). Accordingly, the district court ordered that the City place the referendum petition on Resolution 2018-16 on the ballot, putting the City's approval of the 2018 SDMP to a public vote. All parties appealed.

¶9   We have jurisdiction under Utah Code section 78A-3-102(3)(j).

## STANDARD OF REVIEW

¶10   "We review a district court's grant of summary judgment for correctness, giving no deference to its conclusions of law." *Flowell Elec. Ass'n, Inc. v. Rhodes Pump, LLC*, 2015 UT 87, ¶ 8, 361 P.3d 91.

---

[2] All parties agreed that the only issue presented to the district court was the purely legal question of whether the Resolutions were administrative or legislative in nature. The district court also notified the parties that it would consider entering summary judgment in favor of Petitioners as the nonmoving party, if warranted, pursuant to Utah Rule of Civil Procedure 56(f). Nobody objected.

**ANALYSIS**

¶11 Ivory and the City contend that the district court erred in granting summary judgment in favor of Petitioners with respect to Resolution 2018-16. Conversely, Petitioners contend that the district court erred in granting summary judgment in favor of Ivory and the City with respect to Resolution 2018-17. Because we agree with the district court that Resolution 2018-16 is legislative in nature and Resolution 2018-17 is administrative in nature, we affirm.

I. RESOLUTION 2018-16 IS LEGISLATIVE IN NATURE
AND THEREFORE REFERABLE

¶12 Ivory and the City advance a number of arguments as to why they believe the district court erred in holding that Resolution 2018-16 adopting the 2018 SDMP is legislative in nature. The common theme of these arguments, however, is that the district court incorrectly applied our precedent in *Carter v. Lehi City*, 2012 UT 2, 269 P.3d 141, in determining that Resolution 2018-16 is legislative in nature.

¶13 In *Carter*, this court was tasked with defining the "nature and extent" of the people's power to legislate. 2012 UT 2, ¶ 32. In doing so, this court identified two "key hallmarks" of legislative power. *Id.* ¶ 34. Specifically, "[l]egislative power generally (a) involves the promulgation of laws of general applicability; and (b) is based on the weighing of broad, competing policy considerations." *Id.*

¶14 This court also noted that this power is distinguishable from the executive—or administrative—power, which involves "applying the law to particular individuals or groups based on individual facts and circumstances." *Id.* Drawing on this distinction, we noted that enactment of a broad zoning ordinance constitutes a legislative act, while application of that zoning ordinance to individuals through conditional use permits or variances would constitute an executive act. *Id.* ¶ 71.

¶15 Here, the district court found Resolution 2018-16 to be generally applicable and its approval to have involved the weighing of broad, competing policy considerations. We agree.

*A. Resolution 2018-16 Is Generally Applicable*

¶16 "A 'generally applicable rule' ... sets the governing standard for all cases coming within its terms." *Id.* ¶ 36. In the context of land use, we have held that decisions affecting only one piece of property are generally applicable if "they apply to all present and future parties that meet [their] terms." *Krejci v. City of*

*Saratoga Springs*, 2013 UT 74, ¶ 32, 322 P.3d 662 (citation omitted) (internal quotation marks omitted). In *Krejci*, we concluded that, even though it would only affect one piece of property, a site-specific rezoning was generally applicable because all present and future owners of the site would be bound by the decision to rezone the property. *Id.*[3] Despite Ivory's and the City's arguments to the

---

[3] Ivory and the City argue that this court should distance itself from the notion that a decision that "runs with the land" is one of general applicability. Ivory and the City correctly point out that all (or nearly all) land use decisions, even those that we have deemed administrative such as conditional use permits and variances, necessarily run with the land. And while it may be true that all land use decisions run with the land, and are therefore generally applicable under the *Carter* and *Krejci* framework, Ivory and the City have not carried their burden in asking us to disavow this language. Most importantly, Ivory and the City have not demonstrated that *Carter* and *Krejci* are not entitled to *stare decisis* respect.

This court has provided a framework by which litigants can argue that our precedent is not entitled to *stare decisis* respect. Specifically, those seeking to overturn our precedent must make a showing that the precedent is (1) unpersuasive and/or (2) not firmly established in Utah law. *See Eldridge v. Johndrow*, 2015 UT 21, ¶ 22, 345 P.3d 553. While the City argues that none of our decisions in this area have turned on whether a land use decision runs with the land, it does not address the fact that we have recurred to this language in every one of our land-use-decision opinions since *Carter*. In doing so, we have signaled to the public that they may challenge land use decisions as legislative under a certain theory of general applicability, *see id.* ¶ 35, a reality that Ivory and the City fail to confront. Additionally, neither Ivory nor the City have carried their burden in demonstrating that *Carter* is unpersuasive because it was decided based on weak authority or relied on unsound reasoning. *See id.* ¶ 24. Instead, Ivory and the City simply argue that their interpretations of what constitutes general applicability in land use decisions are preferable to the test we announced in *Carter*. Ivory's and the City's failure to adequately address either of the *Eldridge* factors is fatal to their call to abandon our language in *Carter* and *Krejci*. We wish to emphasize, however, that we are not opposed to revisiting this issue should it properly come before us.

Furthermore, the second part of the *Carter* framework goes a long way toward eliminating any confusion Ivory and the City claim may be caused by our equating general applicability to running with the

(continued . . .)

contrary, Resolution 2018-16 adopting the 2018 SDMP is generally applicable under this framework.

¶17 The 2018 SDMP undoubtedly applies to all present and future parties that meet its terms. Holladay City Code section 13.65.030 provides that "[an SDMP] specific to any development and approved by the city council shall control the development of all property within an R/M-U zoning district." As Petitioners point out, the definition of "development" in the Holladay City Code omits any reference to a specific developer. *See* § 13.04.040. The import of these sections is that an SDMP does not rise or fall with one developer. Rather, any approved SDMP controls the development of the relevant R/M-U zone without regard to the identity of the developer.

¶18 As Ivory acknowledges in its supplemental briefing, any developer could develop land under an already-approved SDMP if the developer could also execute the required ADL with the City. So while Ivory was the developer that both sought approval of the SDMP and executed the required ADL in this instance, nothing in the Holladay City Code prohibits an unrelated developer from obtaining an ADL permitting it to develop the land in accordance with the 2018 SDMP. That is, the 2018 SDMP applies to all parties, present and future,[4] that meet its terms by executing a

---

land. As discussed above, *see supra* ¶ 14, we have announced that the adoption of a zoning ordinance is legislative but issuance of a conditional use permit or variance is administrative. While both conditional use permits and variances run with the land, and are therefore generally applicable under our precedent, they do not involve the weighing of broad, competing policy considerations that accompanies the enactment of a zoning ordinance. Rather, the decision to issue a conditional use permit or variance depends on the application of law to the specific facts of the request for a conditional use permit or variance. *See Krejci*, 2013 UT 74, ¶¶ 34–36. So although all land use decisions may be generally applicable, this alone "does not compel the conclusion that a certain action is legislative," and the second part of the *Carter* framework can be used to separate those decisions that are legislative from those that are administrative. *Id.* ¶ 33.

[4] Ivory agrees that an approved SDMP does not terminate unless and until a new or amended SDMP is submitted and approved by the City. In this sense, the 2018 SDMP is generally applicable because

(continued . . .)

corresponding ADL with the City. Therefore, the 2018 SDMP is generally applicable.

*B. The City Weighed Broad, Competing Policy Considerations on Approving Resolution 2018-16*

¶19 Having established that Resolution 2018-16 is generally applicable, we must now "evaluate whether [Resolution 2018-16] implicates the weighing of broad, competing policy considerations." *Krejci*, 2013 UT 74, ¶ 33. Instead of applying existing law to the specific facts of an individual case, as would be done in an administrative act, the exercise of legislative power involves the weighing of "[a]ny and all considerations." *Id.* ¶ 34. For example, in *Suarez v. Grand County*, we found that the Grand County Council weighed broad policy considerations when it considered, among other things: (1) the suitability of the development based on environmental and scenic quality impacts, (2) the consistency of the proposed use with the character of existing land uses in the area, (3) the mitigation of any potential adverse effects of the development, and (4) the ability of the public infrastructure to serve the development. 2012 UT 72, ¶ 39, 296 P.3d 688.

¶20 Here, the City weighed similarly broad considerations in deciding to approve the 2018 SDMP. Specifically, Resolution 2018-16 states that the City found that:

> (1) the [2018 SDMP] meets the intended vision for the R/M-U Zone and addresses the technical items required by the Zone Regulations; (2) submitted traffic studies show that the Project will have a reduced overall impact, when compared to the [2007 SDMP], and very little modification or improvement of existing streets and related infrastructure is required; (3) the proposed residential densities, while increased, in respect to the [2007 SDMP], are compatible with the existing residential development in the area and are necessary to support the commercial and retail aspects of the Project; (4) the proposed building heights are an integral part of the overall design and function of the Project and are warranted in this area of the City; (5) the proposed residential and commercial

any future developer looking to develop the Site would be subject to the 2018 SDMP unless and until they submitted, and the City approved, a new or amended SDMP.

development will foster redevelopment and increase property values of surrounding properties; and (6) the proposed commercial/retail development is a needed component of the City's economic stability and represents viable and sustainable development given current economic conditions.

¶21 It is obvious from the face of Resolution 2018-16 that the City considered broad, competing policy considerations in approving the 2018 SDMP. Findings two through six clearly contemplate how approval of the 2018 SDMP would affect the City as a whole. The City seems to have considered everything from traffic impact in the area surrounding the Site to the City's economic stability as a whole. Indeed, it is difficult to imagine a more broad policy consideration than the economic stability of an entire city. These broad considerations are unsurprising given the City's stated purpose for an SDMP.

¶22 Utah's Municipal Land Use, Development, and Management Act (MLUDMA) requires the legislative body of every municipality to adopt a general plan outlining the needs of and proposed growth and development strategy for that municipality. UTAH CODE §§ 10-9a-401, -404. Pursuant to MLUDMA, the City has adopted a general plan that "provides an overall picture of what the community values, both now and in the future, and how those values will be protected and implemented." *See General Plan*, CITY OF HOLLADAY, http://cityofholladay.com/departments/community-development/general-plan/ [http://perma.cc/3XG9-N2GE] (last visited Nov. 21, 2018). According to the City, the City's general plan is "primarily used when the Planning Commission and Council are making land use decisions like rezones and changes to the zoning ordinance that shape the growth of the city." *Id.*

¶23 Holladay City Code section 13.65.060 states that an "SDMP will serve in the same way as the city's general plan does . . . ; it is a comprehensive but flexible guide for the overall development and design of the entire site." It makes sense, then, that the City would weigh broad policy considerations in approving the 2018 SDMP. Because the 2018 SDMP must serve as a guide for the overall development and design of the site, the City could not just apply existing law to a narrow set of individualized facts, as it would when

considering a conditional use permit or a variance.[5] Instead, the City had to weigh broad, competing policy considerations in deciding to adopt Resolution 2018-16.

¶24 Amici in this case[6] raise concerns that our decision today could wreak widespread havoc with respect to other large, master-planned communities that have been built across Utah. Amici fear that these communities—which are developed using flexible, long-term site development plans as authorized by MLUDMA—will become the targets of citizen referenda, jeopardizing the sizable investments of landowners, developers, and local governments. Should every one of these types of developments be potentially subject to referendum, amici argue, the existing relationship between land development and government regulation will be upended and interest in the land development market will subside.

¶25 We are sensitive to these concerns and wish to reiterate that it is this structure of the R/M-U zoning ordinance and the policy decisions the City made when adopting the 2018 SDMP that drive our conclusion that Resolution 2018-16 is legislative in nature. We are particularly persuaded by the fact that the SDMP effectively

---

[5] This is confirmed by Appendix A of the City's Land Use and Development Code. Appendix A provides a table of conditional, permitted, and disallowed uses for every zone in the City except the R/M-U zone. *See* HOLLADAY, UTAH, CODE § 13.100.010. Instead, Appendix A simply refers the reader to the SDMP to determine whether a use is conditional, permitted, or disallowed in the R/M-U zone. Therefore, it would be impossible for the City to simply apply existing law to individualized facts in approving the SDMP because the SDMP itself is the document that creates the relevant underlying law.

Appendix A also confirms that the 2018 SDMP acts very similarly to a zoning ordinance, whose adoption we have conclusively declared to be a legislative act. *Carter*, 2012 UT 2, ¶ 71 (stating that "enacting a broad zoning ordinance is a legislative act"). In effect, the R/M-U zone contemplates the subsequent adoption of a second general plan in the form of an SDMP to fill in the wide gaps left by the R/M-U zoning ordinance.

[6] Amici curiae here consist of the Utah Homebuilders Association, Northern Wasatch Association of Realtors, Salt Lake Board of Realtors, and Utah Property Rights Coalition.

serves as a general plan for the R/M-U zone. *See supra* ¶ 23 & n.5. In so holding, we do not mean to suggest that every site development plan approved pursuant to a zoning ordinance will be legislative in nature. Indeed, it is entirely possible that many site development plan approvals (and, more generally, land use application approvals) will constitute administrative acts. Such a determination, however, is entirely dependent on how the municipality reaches its decision.

¶26 If the municipality's decision is "open-ended" and made without reference to "fixed criteria," then the decision may be legislative. *Krejci*, 2013 UT 74, ¶ 34. But if the municipality's decision involves the "application of existing law to the facts presented by an individual applicant" or is "limited to the evaluation of specific criteria fixed by law," then the decision is administrative. *Id.*

¶27 In the instant case, the fact that the R/M-U zoning ordinance calls for a subsequent SDMP does not tell us whether Holladay acted in a legislative or administrative capacity. The question turns on what the City considered in approving the 2018 SDMP. If the R/M-U zoning ordinance provided specific criteria which bound the City's discretion in approving an SDMP, and Ivory's compliance with those criteria would have been sufficient to approve the application, then the City's approval could very well have been administrative. But that is not what happened here. Instead, the R/M-U zoning ordinance provides that "[the City] shall only approve an SDMP for those projects that comply with the vision and purpose of [the R/M-U zoning ordinance]." HOLLADAY, UTAH, CODE § 13.65.070. Rather than giving the City specific criteria to evaluate in approving an SDMP, the R/M-U zoning ordinance conditions approval on the City's determination that the SDMP complies with the amorphous vision and purpose sections of the ordinance, leaving the City to determine whether an SDMP does things such as "anticipate[] development of a vibrant community" or "allow[] flexibility [and] creative expression." *See id.* §§ 13.65.010, .020. In other words, the R/M-U zoning ordinance expressly invites the weighing of broad, competing policy considerations that the City undertook in approving Resolution 2018-16.

## II. RESOLUTION 2018-17 IS ADMINISTRATIVE IN NATURE AND THEREFORE NOT REFERABLE

¶28 The district court found that Resolution 2018-17 exhibited neither of the hallmarks of legislative power as described in *Carter v. Lehi City*, 2012 UT 2, 269 P.3d 141, in that it is not generally

applicable and its adoption did not involve the weighing of broad, competing policy considerations.[7] We agree.

### A. Resolution 2018-17 Is Not Generally Applicable

¶29  As we explained in *Carter*, "[g]overnment decisions to enter into a contract with a specific entity . . . are not legislative." 2012 UT 2, ¶ 67. The decision to enter a contract alone cannot constitute legislative action.

¶30 As opposed to the 2018 SDMP, which governs the development of the Site without regard to the identity of the developer, the Amended ADL is simply a contract between four parties setting forth the obligations of those parties.[8] Unlike the 2018 SDMP, an unrelated third party could not come in after approval of the Amended ADL and avail itself of the terms of the Amended ADL because it was not one of the contracting parties (nor would it be a successor or assignee of these parties). So while an unrelated developer could develop the Site in accordance with the

---

[7] The district court also acknowledged that it believed Resolution 2018-17 presented a close call in line drawing between administrative and legislative acts and that, pursuant to *Carter*, 2012 UT 2, ¶ 75, any doubt would be resolved by giving "controlling significance" to the form of the City's decision. Because we do not view Resolution 2018-17 as presenting a close call in line drawing, we do not need to resolve such doubts in reaching our decision. However, we note that giving controlling significance to the form of a municipality's decision could be troublesome in some instances. While we have noted that a municipality's own characterization of its action and the formal process by which the municipality acts are relevant considerations in this inquiry, *Suarez v. Grand County*, 2012 UT 72, ¶ 41, 296 P.3d 688, these factors present the potential for abuse by the proverbial fox guarding the henhouse. That is, a municipality wishing to have its actions found to be legislative or administrative could characterize and process its own actions in a way that leads to its desired result. Accordingly, we submit that the more relevant inquiry in determining the form of an underlying decision is "the substance of [the decision]." *Id.*

[8] For example, the Amended ADL describes the specific obligations of Ivory and the City as they relate to issues such as tax subsidies, the construction and installation of site improvements, prohibitions against transfer and assignment, and remedies in the event of breach by either party.

2018 SDMP, that same developer would not be able to take advantage of the terms negotiated in the Amended ADL. Rather, the new developer would have to negotiate the terms of its own ADL. In this sense, the Amended ADL has very limited and specific applicability in that it applies only to those parties that negotiated its terms.

¶31  Petitioners argue that, in *Suarez v. Grand County*, 2012 UT 72, 296 P.3d 688, we held a development agreement between Grand County and a developer to be legislative. Petitioners suggest that *Suarez* stands for the proposition that contracts that claim to run with the land, like the Amended ADL,[9] create laws of general applicability. Petitioners' argument comes close, but narrowly misses the mark.

¶32 In *Suarez*, this court considered "whether the [Grand County] Council acted in its legislative or administrative capacity when it adopted Ordinance 454." 2012 UT 72, ¶ 2. The sequence of events leading to the adoption of Ordinance 454 closely parallels the sequence of events leading to the approval of Resolution 2018-17.

¶33 In 2002, the Grand County Council adopted a resolution approving a rezoning for a large parcel of land. *Id.* ¶ 3. The resolution also provided that the preliminary master plan for the development was subject to a development agreement between the county and the developer. *Id.* The original developer eventually abandoned the project and a new developer, Cloudrock, succeeded to the original developer's interest in the development. *Id.* ¶ 6. Cloudrock submitted an application to Grand County Planning Commission to begin the process of amending the approvals granted to the original developer in 2002. *Id.* As part of this process, the Planning Commission recommended certain changes, including changes to the original development agreement. *Id.* ¶ 7. Cloudrock later submitted an application including an amended development agreement, an amended master plan, and an amended preliminary plat. *Id.* ¶¶ 9–10. The Grand County Council voted to approve Ordinance 454, which approved Cloudrock's application. *Id.* ¶ 10. A group of citizens then brought a challenge to Ordinance 454. *Id.* ¶ 1. Where *Suarez* and the instant case diverge is in the contents of the

---

[9] Section 4.2 of the Amended ADL provides, in part, that the "covenants provided in [the Amended ADL] shall be covenants running with the land."

respective development agreements and in the nature of the actions brought.

¶34 Unlike the Amended ADL, the amended development agreement in *Suarez* contained an exhibit called the Cloudrock Code. *Id.* ¶ 12. The Cloudrock Code "create[d] zones within the [development], provide[d] maps depicting the locations of these zones, and put[] forth regulation within these zones." *Id.* ¶ 27. The Cloudrock Code also provided the means by which administrative deviations from the ordinance could be granted. *Id.* ¶ 33. The contents of the Cloudrock Code are very similar, then, to the contents of the 2018 SDMP. However, unlike the 2018 SDMP, which is a document that exists separately from the Amended ADL, the Cloudrock Code was adopted contemporaneously with the amended development agreement as an exhibit thereto. *See id.* ¶ 10. ("Ordinance 454 explains that Cloudrock had submitted . . . the [amended development agreement], which [was] incorporated [t]herein by reference, including all exhibits thereto." (internal quotation marks omitted)). In other words, the Cloudrock Code was adopted by the Grand County Council as part and parcel of the amended development agreement.

¶35 And unlike the current action, which challenges two separate documents approved in two separate resolutions, Ordinance 454 was challenged in its entirety. *See id.* ¶ 45 n.55 (noting that the court was only considering Ordinance 454 as a whole and that the citizens did not provide "an analysis of why [the court] should conclude that any individual component of [Ordinance 454] is administrative rather than legislative"). That is, this court considered Ordinance 454 as a cohesive whole in reaching the determination that it was legislative as opposed to determining whether each individual component—the agreement, the master plan, and the subdivision plat—of Ordinance 454 was legislative or administrative.

¶36 These two differences inform our understanding of the pronouncement in *Suarez* that Ordinance 454 was generally applicable. Specifically, we said that, "because the [amended development agreement] states that it will run with the land, and the Cloudrock Code allows administrative deviations from the general rules imposed by the ordinance, we conclude that Ordinance 454 is a law of general applicability." *Id.* ¶ 34. Here, Petitioners argue that "with respect to general applicability, the Amended ADL runs with the land as did the *Suarez* agreement."

¶37 Petitioners, however, overextend our conclusion in *Suarez*. First, we held that Ordinance 454 was a law of general applicability, not that the amended development agreement itself was a law of general applicability. In fact, we explicitly declined to address whether individual components of Ordinance 454 were legislative or administrative. *Id.* ¶ 45 n.55. Second, to the extent our statement in *Suarez* linked the amended development agreement's proclamation to run with the land to general applicability, this statement is inextricably tied to the concomitant adoption of the Cloudrock Code. Because the Cloudrock Code was adopted as part of the amended development agreement, any statement about the general applicability of the amended development agreement cannot be divorced from the Cloudrock Code, which itself announced generally applicable laws such as zoning ordinances for the development. Because our holding in *Suarez* applied only to Ordinance 454 as a whole, and because there the amended development agreement also included the Cloudrock Code, we cannot say that the Amended ADL is generally applicable simply on the basis that it purports to run with the land.[10]

### B. The City Did Not Weigh Broad, Competing Policy Considerations in Approving Resolution 2018-17

¶38 When the time came to approve Resolution 2018-17, the City had already done most of the heavy lifting in adopting Resolution 2018-16. Instead of weighing broad, competing policy considerations in approving the Amended ADL, the City was "grant[ing] specific rights *pursuant to an approved [SDMP]*." HOLLADAY, UTAH, CODE § 13.65.070 (emphasis added). While an ADL must address certain development considerations, *see id.*, the primary purpose of the Amended ADL is to spell out the obligations of the contracting parties pursuant to the 2018 SDMP. In this sense, the Amended ADL involves the application of the 2018 SDMP to the

---

[10] Furthermore, as Ivory points out, even if the covenants in the Amended ADL did run with the land, they would only bind strangers to the contract to the extent that the law of contracts permits it. *See, e.g., Stern v. Metro. Water Dist. of Salt Lake & Sandy*, 2012 UT 16, ¶ 40, 274 P.3d 935 (discussing the four requirements for a restrictive covenant to bind successive owners of burdened or benefited land). This stands in stark contrast to a legislative action, such as enacting a broad zoning ordinance, which applies to all persons without the need to first consult other areas of law such as contract law.

specific circumstances of the parties negotiating the Amended ADL. While the City may have weighed important considerations in negotiating the Amended ADL, they were nonetheless unique to the specific facts of this individual case. This type of action is "fundamentally administrative" and does not implicate the weighing of broad, competing policy considerations. *Krejci v. City of Saratoga Springs*, 2013 UT 74, ¶ 34, 322 P.3d 662.

## CONCLUSION

¶39  We agree with the district court that the City was exercising its legislative powers when it approved Resolution 2018-16. The Amended SDMP promulgates a law of general applicability and its approval required the weighing of broad, competing policy considerations. Resolution 2018-16 is therefore referable.

¶40 We also agree with the district court that the City was exercising its administrative powers when it approved Resolution 2018-17. The Amended ADL applies only to the contracting parties and its approval involved the application of law to specific facts. Resolution 2018-17 is therefore not referable.

---

ASSOCIATE CHIEF JUSTICE LEE, concurring:

¶41  I agree with and accordingly concur in the majority opinion as far as it goes. I write separately only to say that I would go a step further than the court does in clarifying the role that the "running with the land" factor plays in assessing whether a land use decision is legislative or administrative. The majority acknowledges that "all (or nearly all) land use decisions, even those that we have deemed administrative such as conditional use permits and variances, necessarily run with the land." *Supra* ¶ 16 n.3. It also concedes that we have said that variances and conditional use permits are administrative decisions despite the fact that they "run with the land." And it notes that our decision in *Krejci v. City of Saratoga Springs*, 2013 UT 74, 322 P.3d 662, identified grounds for treating variances and conditional use permits as administrative despite the fact that they run with the land.

¶42 Notwithstanding the foregoing, the court stops short of "disavow[ing]" the "runs with the land" factor as an element of our analysis in this field. *Supra* ¶ 16 n.3. It faults the parties for not presenting argument under factors set forth in *Eldridge v. Johndrow*, 2015 UT 21, 345 P.3d 553. And it concludes that this failure "is fatal" to the parties' request that we disavow our law's consideration of whether a land use decision "runs with the land." *Supra* ¶ 16 n.3.

¶43  I see no barrier to open disavowal of this factor. The parties' briefs have highlighted the fact (noted by the majority) that the "runs with the land" factor isn't doing any work in this field. That is enough to convince me of the merits of an open acknowledgment of this reality. And I do not think that that acknowledgement requires the same kind of *stare decisis* analysis that would be required if we were outright overruling a prior decision, or completely reformulating a legal doctrine. In owning up to the fact that the "running with the land" factor plays no role in our decisions we would not be overruling *Carter* or *Krejci*. We would just be stating a reality. I would do that here, and I see no barrier to that move in the doctrine of *stare decisis*.

———————