**2020 UT App 41**

# THE UTAH COURT OF APPEALS

LD III LLC,
Appellant,
*v.*
MAPLETON CITY,
Appellee.

Opinion
No. 20190090-CA
Filed March 19, 2020

Fourth District Court, Provo Department
The Honorable James R. Taylor
No. 170401683

Denver C. Snuffer Jr., Attorney for Appellant

Eric T. Johnson and Robert Alan Patterson, Attorneys
for Appellee

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES KATE APPLEBY and RYAN M. HARRIS concurred.

MORTENSEN, Judge:

¶1 Through the years, a tract of land (Property) in Mapleton, Utah, passed through various hands, eventually ending up in the possession of LD III, LLC (LDIII). When LDIII sought to develop the Property into 176 residential units, the Mapleton city council approved a modification of the applicable zoning ordinance. Mapleton citizens challenged the zoning change, however, and reversed it through a voter referendum. This prompted LDIII to seek a declaratory judgment in the district court, where LDIII lost on summary judgment. We affirm.

## BACKGROUND[1]

### *The Original Agreement*

¶2 In 2003, Suburban Land Reserve, Inc. (Suburban) owned the Property, which at the time consisted of roughly 245 acres of undeveloped real estate on Mapleton's east bench. Suburban thereafter entered into a development agreement (Original Agreement) with Mapleton, wherein Suburban conveyed about 76 acres of the Property to Mapleton. In exchange, Mapleton passed an ordinance zoning the remaining approximate 170 acres with a 136-residential-unit maximum density and a TDR-R overlay, meaning it was a receiving site for transferable development rights (TDRs).[2] Mapleton also granted 77 TDRs to Suburban.

¶3 As relevant to this appeal, the Original Agreement included the following provisions. Section 2 provided for the zone change of the two parts of the Property and for the conveyance of the TDRs to Suburban. Section 6 provided that "the Owner has a vested right to develop a maximum of one

---

1. On appeal from a district court's summary judgment ruling, we view "the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party"—here, LDIII. *Jordan Constr., Inc. v. Federal Nat'l Mortgage Ass'n*, 2017 UT 28, ¶ 24, 408 P.3d 296 (cleaned up).

2. TDRs allow landowners to be "compensated for loss of development opportunities by being given development rights that can be used elsewhere to exceed applicable restrictions in the 'receiving area.' In effect, TDRs involve shifting potential development from one area to another, with the result that sensitive land is preserved." *Crystal Forest Assocs., LP v. Buckingham Twp. Supervisors*, 872 A.2d 206, 211 n.8 (Pa. Commw. Ct. 2005). *See generally* Utah Code Ann. § 10-9a-509.7 (LexisNexis 2015).

hundred thirty-six (136) single family residential units on individual lots." Section 10 stated in full:

> 10. <u>Assignment of Agreement</u>. Owner's rights under this Agreement shall be personal to Owner and shall only run with the land so long as Owner or a company which is affiliated with or under common ownership and control of Owner shall own and be the Owner of the Property. In the event that Owner intends to sell the Property or any portion thereof to any other party, Owner shall advise City of such intention. Only upon the express prior written approval by the City, shall any rights of Owner with respect to the portion of the Property being sold be deemed transferred to the new owner thereof. City may withhold such approval in the exercise of its reasonable business judgment, based upon conditions that exist at the time of the transfer, the proposed transferee and the history of the development of the Project prior to such time.

Section 19 also dealt with the Property passing to another entity:

> 19. <u>Successors and Assigns</u>. This Agreement shall be binding on the successors and assigns of Owner. . . . In the event of an approved sale or transfer of the Project, or any portion thereof, the seller or transferor and the buyer or transferee shall be jointly and severally liable for the performance of each of the obligations contained in this Agreement, unless . . . [otherwise] approved by City. Alternatively, prior to such approved sale or transfer, Owner shall obtain from buyer or transferee a letter [meeting certain conditions].

Finally, Section 21 provided that "this Agreement or a memorandum providing public notice of the existence of this Agreement shall be recorded immediately as a covenant running with the Property herein described in order to put prospective purchasers or other interested parties on notice as to the terms and provisions hereof."

*Transfer of the Property to the Preserve*

¶4    Ultimately, Suburban did not develop the Property as planned. In December 2005, Suburban transferred the Property to another entity (Preserve). Pursuant to Section 10 of the Original Agreement, the Mapleton city council approved this transfer. Later on, at the request of the Preserve (LDIII's predecessor in interest), the city council approved a change of the base zoning of the Property from A-2 with a TDR-R overlay to a base zone of PRC-4 without the TDR-R designation. The PRC-4 zone is a site-specific designation that, in this case, called for a planned residential community and the creation of a 92-unit density cap. *See* Mapleton, Utah, Mun. Code § 18.82D.110 (2007) ("The total density allowed in the Preserve at Mapleton PRC-4 zone is ninety-two (92) individual building lots and common area buildings. No new subdivision lots shall be permitted beyond those originally approved for the purpose of increasing this density.").[3] Mapleton's zoning maps reflected the changes. The changes were entirely in line with the Preserve's request; indeed, the Preserve drafted the PRC-4 zone language.

---

3. Although the zoning ordinance does not expressly address the TDR-R overlay, its second sentence states, "No new subdivision lots shall be permitted beyond those originally approved for the purpose of increasing this density," Mapleton, Utah, Mun. Code § 18.82D.110 (2007), thereby removing the TDR-R overlay as reflected by Mapleton's subsequent zoning maps. Furthermore, the Preserve was satisfied with a 92-unit-maximum density and did not request that the TDR-R overlay remain.

¶5    After obtaining the zoning change it requested, the Preserve executed a promissory note in favor of LDIII. In 2008, LDIII foreclosed on the Property, which still was zoned as PRC-4 with a cap of 92 units, and obtained ownership. Mapleton did not approve of the transfer of ownership of the Property to LDIII, however, either before or after the foreclosure. And LDIII does not contend that it ever obtained written approval of the transfer of ownership.

¶6    In 2017, many years after acquiring the Property, LDIII contracted with another company to develop it. The development company sought approval from Mapleton for a 176-unit development on the Property. In June 2017, the Mapleton city council acceded to the development company's request and modified the zoning designation of the Property to include a TDR-R overlay and a maximum of 169 units. However, shortly thereafter, Mapleton citizens challenged the Property's rezoning through a voter referendum. The referendum received the required votes to invalidate the zoning change, and therefore the Property ultimately did not obtain a change in its base zoning, unit-density cap, or TDR-R overlay status.

¶7    LDIII then sought a declaratory judgment from the district court regarding whether pertinent zoning ordinances or the Original Agreement allowed the development plan. LDIII also argued that the referendum was invalid. Mapleton opposed LDIII's lawsuit and asked the district court to dismiss it on summary judgment. The district court granted Mapleton's motion and dismissed LDIII's lawsuit.

¶8    LDIII appeals.


ISSUE AND STANDARD OF REVIEW

¶9    LDIII contends that the district court erred in granting summary judgment to Mapleton. To support this position, LDIII first argues that it benefits from the zoning "density entitlement"

set forth in the Original Agreement, claiming that the zoning rights afforded to Suburban in the Original Agreement ran with the land. LDIII alternatively claims that there is an ambiguity as to whether the rights run with the land. LDIII also argues that even if it did not receive its desired zoning through contractual or property rights, it did through Mapleton city council's 2017 decision to rezone the Property, and it claims that those rights still exist because the referendum overriding that decision was invalid.[4]

¶10   "An appellate court reviews a [district] court's legal conclusions and ultimate grant or denial of summary judgment for correctness," giving no deference to the district court's legal conclusions. *Jordan Constr., Inc. v. Federal Nat'l Mortgage Ass'n*, 2017 UT 28, ¶ 24, 408 P.3d 296 (cleaned up). Summary judgment is appropriate "only when, viewing all facts and reasonable inferences therefrom in the light most favorable to the nonmoving party, there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." *Morra v. Grand County*, 2010 UT 21, ¶ 12, 230 P.3d 1022 (cleaned up); *see also* Utah R. Civ. P. 56(a). We therefore review the district court's grant of summary judgment to Mapleton for correctness.

ANALYSIS

¶11   LDIII searches for a legal means to increase its developmental density rights through either the Original

---

4. The parties also dispute whether LDIII was time-barred from asserting its rights and whether the Preserve (LDIII's predecessor in interest) waived its rights under the Original Agreement. Because we conclude that the zoning rights Suburban and the Preserve enjoyed under the Original Agreement were not passed on to LDIII, we have no need to address these other arguments.

Agreement or through the 2017 rezoning of the Property and a claimed invalidity of the voter referendum. We address these issues in turn.

## I. The Original Agreement

¶12 The district court ruled that any rights under the Original Agreement "did not survive [LDIII's] foreclosure proceedings." We agree. "As with any contract, we determine what the parties have agreed upon by looking first to the plain language within the four corners of the document." *Peterson & Simpson v. IHC Health Services, Inc.*, 2009 UT 54, ¶ 13, 217 P.3d 716. "When interpreting the plain language, we look for a reading that harmonizes the provisions and avoids rendering any provision meaningless." *Id.* (cleaned up). "Harmonizing conflicting or apparently ambiguous contract language before concluding that provisions are actually ambiguous is an important step in the hierarchy of rules for contract interpretation." *Gillmor v. Macey*, 2005 UT App 351, ¶ 19, 121 P.3d 57. "When the contract provisions are clear and complete, the meaning of the contract can appropriately be resolved by the court on summary judgment." *Basic Research, LLC v. Admiral Ins. Co.*, 2013 UT 6, ¶ 5, 297 P.3d 578 (cleaned up); *see also McEwan v. Mountain Land Support Corp.*, 2005 UT App 240, ¶ 16, 116 P.3d 955 ("If language within the four corners of the contract is unambiguous, the parties' intentions are determined from the plain meaning of the contractual language, and the contract may be interpreted as a matter of law." (cleaned up)).

¶13 Having applied these fundamental steps in our review of the Original Agreement, we conclude that the Original Agreement did not confer zoning rights to LDIII, and the rights enjoyed by Suburban and the Preserve did not run with the land to LDIII. For a covenant to run with the land, as opposed to being a personal covenant, four elements must be met: "(1) the covenant must touch and concern the land affected by the covenant, (2) the original parties to the covenant must have expressly or impliedly intended the covenant to run with the

land, (3) there must be privity of estate, and (4) the covenant must be in writing." *Stern v. Metropolitan Water Dist. of Salt Lake & Sandy*, 2012 UT 16, ¶ 40, 274 P.3d 935 (cleaned up).

¶14 Here, the second element—intent that the covenant run with the land—was unambiguously absent under the plain language of the Original Agreement. Indeed, the original parties specifically limited the extent to which the covenants might run with the land. Section 10 described the contractual rights to be "personal" to Suburban. Section 10 also specifically stated that the rights "shall only run with the land so long as Owner or a company which is affiliated with or under common ownership and control of Owner shall own and be the Owner of the Property" or "[o]nly upon the express prior written approval by the City, shall any rights of Owner with respect to the portion of the Property being sold be deemed transferred to the new owner thereof." Thus, this plain language dictated that LDIII meet the affiliated-ownership requirement or the city-approval requirement for the zoning rights to pass contractually.

¶15 LDIII does not assert that it meets either requirement. Rather, LDIII argues that its predecessors' contractual rights ran with the land and cites various provisions of the Original Agreement—Sections 2, 6, 19, and 21—that it claims at least create an ambiguity about whether the rights under the Original Agreement ran with the land. We disagree. "A contract term is not ambiguous simply because one party ascribes a different meaning to it to suit his or her own interests." *Basic Research, LLC*, 2013 UT 6, ¶ 10 (cleaned up). This court faced a similar situation in *Gillmor*. There, the contract stated, "in several places, that the grants and limitations in the [a]greement [we]re appurtenant to the land and r[a]n with the land to future successors in interest." *Gillmor*, 2005 UT App 351, ¶ 17. However, "the [a]greement also detail[ed] a specific and limited class of individuals who [we]re to be benefitted by" the provisions of the contract. *Id.* This court explained that the "specificity of the provision granting access to 'Gillmor and his immediate family to the first degree of consanguinity, and their

spouses and children,' undermine[d] any notion that this benefit [wa]s somehow intended to run with the land to the benefit of *all* future owners of the Gillmor property." *Id.* (emphasis added) (cleaned up). Thus, like the contract in *Gillmor*, the Original Agreement expressly limited the manner in which the rights would pass (ownership-affiliated or city-approved parties)—classes to which LDIII indisputably does not belong.

¶16 Although other provisions of the Original Agreement, including Sections 19 and 21, indicate that the Original Agreement will generally "be binding on the successors and assigns" of Suburban, and that it should be "recorded . . . as a covenant running with the Property . . . in order to put prospective purchasers . . . on notice as to the terms and conditions hereof," Section 10 explicitly specifies the conditions under which the contractual rights, including zoning rights, would run with the land. None of the provisions LDIII cites contradicts Section 10; instead, they merely elaborate how the Original Agreement operates. For instance, Section 21 was intended to put "parties on notice as to the terms and provisions" of the Original Agreement—one of those provisions being Section 10. And Section 19 is best read as a general indication that the obligations of the Original Agreement would be binding on future owners of the Property. Moreover, that provision twice refers to an "approved sale or transfer" of the Property, indicating that it can be read harmoniously with Section 10 and indicating that the drafters of the Original Agreement clearly intended that Mapleton approve any new owners.[5] In short, we do not see the provisions listed by LDIII as

---

5. What's more, Section 2's language that "the Property shall be the recipient of the density transferred from" the sending site—Mapleton's TDR-S portion of the Property—was included to reflect the intent to apply a TDR-R overlay to the Property, not to grant TDRs to the Property itself. This is clear from later language in Section 2 itself specifically granting to Suburban—as opposed to the Property—a specified number of "density units,"

(continued…)

raising an ambiguity about whether Mapleton had to approve any new owner of the Property for the rights under the Original Agreement to pass. The city-approval requirement is unambiguously a part of the Original Agreement, and LDIII indisputably never received Mapleton's approval.

¶17 And while all the provisions of the Original Agreement can be read harmoniously under the interpretation advanced by Mapleton, Section 10 would be rendered meaningless by LDIII's reading. Section 10 expressly provides that rights under the Original Agreement run with the land only where Suburban or a company affiliated with Suburban owns the Property, or where Mapleton provides "express prior written approval" of the transfer of any of the Owner's rights—including TDRs—to a new owner. Section 10 also expressly allows the City to withhold approval. LDIII's reading—that the zoning rights run with the land no matter what—renders all these express provisions without effect. Rather than an express or implied intention that the terms of the Original Agreement would run with the land, Section 10 provides an unambiguous intention that, without express consent in writing, they do not.

¶18 Accordingly, because the Original Agreement is not ambiguous, and because there is no genuine dispute as to the lack of Section 10's requirements being met, we affirm the district court's ruling that the zoning rights under the Original Agreement did not pass to LDIII. *See Basic Research, LLC*, 2013 UT 6, ¶ 5.

## II. Validity of the Referendum

¶19 Even if LDIII has no rights stemming from the Original Agreement, LDIII claims that the Property nevertheless bears its

---

(…continued)
i.e., TDRs. And we see no ambiguity arising from Section 6 of the Original Agreement either.

desired zoning by virtue of the 2017 Mapleton city council decision—which was made independent of any rights under the Original Agreement—to rezone the Property. LDIII correctly notes that the 2017 decision gave it the rights it sought, but that decision was erased by a subsequent citizen referendum. LDIII takes issue with the validity of that citizen referendum, claiming that it was invalid because the 2017 rezoning was "an individual property zoning decision" and thus not legislative and not subject to a referendum. This issue indeed turns on whether the rezoning of the Property was legislative or administrative. *Krejci v. City of Saratoga Springs*, 2013 UT 74, ¶ 21, 322 P.3d 662 ("[W]hen a city council exercises its legislative authority, voters retain the constitutional prerogative of challenging its decisions by referendum. But where the city council is acting pursuant to its administrative authority, the voters have no such right."). However, LDIII is incorrect that the rezoning of the Property was not legislative. *See id.* ¶ 38.

¶20   In *Krejci*, our supreme court held that "site-specific rezoning [is] a legislative act—and thus subject to referendum." *Id.*[6] In so holding, the court explained that site-specific zoning is legislative because it "requires the weighing of broad, competing policy considerations and results in a law of general applicability"—the "chief hallmarks of legislative action." *Id.* ¶¶ 22, 31 (cleaned up). Nevertheless, LDIII wields the two

---

6. LDIII's argument that the referendum was statutorily prohibited by then-section 20A-7-101(13) of the Utah Code, now-section 20A-7-101(15)(b), was specifically rejected by the court in *Krejci*. The court explained that although "site-specific rezoning decisions are statutorily ineligible for referendum under the terms of this provision[,] . . . the people's power to legislate is not a creature of statute. It is inherent power—authority reserved by the people in our constitution. So the legislature's failure to delegate referendum power is not the end of the inquiry." *Krejci v. City of Saratoga Springs*, 2013 UT 74, ¶ 24, 322 P.3d 662; *see also* Utah Const. art. VI, § 1.

referendum holdings in *Baker v. Carlson*, 2018 UT 59, 437 P.3d 333, in an attempt to stave off *Krejci*'s holding and to show that the rezoning was not legislative and therefore not referable. But *Baker*'s holdings do not shed further light on the case at hand. Neither decision was a zoning change. Rather, one dealt with amending a site development plan, which was held to be a legislative action, and the other was related to amending an agreement for the development of land, which was held to be an administrative action. *Id.* ¶¶ 39–40. Thus, LDIII's focus on the holdings in *Baker* is unhelpful in resolving this case, which involves a site-specific rezoning.[7]

¶21    In short, our analysis begins and ends with *Krejci*'s holding. Based on it and the undisputed facts of this case, we affirm the district court's conclusion that the referendum was valid.

## CONCLUSION

¶22    Because the district court's conclusions of law were correct—entitling Mapleton to judgment as a matter of law—and there are no genuine disputes as to any material facts, we affirm the district court's entry of summary judgment in favor of Mapleton.

_____

7. Indeed, in *Baker*, the supreme court cited *Krejci* with approval, setting forth its holding that "even though it would only affect one piece of property, a site-specific rezoning was generally applicable" and therefore subject to referendum "because all present and future owners of the site would be bound by the decision to rezone the property." *Baker v. Carlson*, 2018 UT 59, ¶ 16, 437 P.3d 333 (citing *Krejci*, 2013 UT 74, ¶ 32).